# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

GOTV STREAMING, LLC,

*Plaintiff-Appellant,*

*v.*

NETFLIX, INC.,

*Defendant-Cross-Appellant.*

On Appeal from the United States District Court for the Central District of California, No. 2:22-cv-07556-RGK-SHK, Judge R. Gary Klausner

## NON-CONFIDENTIAL BRIEF FOR DEFENDANT-CROSS-APPELLANT NETFLIX, INC.

INDRANIL MUKERJI
STEPHEN A. MARSHALL
ALIZA GEORGE CARRANO
WILLKIE FARR AND
   GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1190

DEVON W. EDWARDS
WILLKIE FARR AND
   GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8650

LAUREN MATLOCK-COLANGELO
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

August 21, 2024    *Attorneys for Defendant-Cross-Appellant Netflix, Inc.*

# PATENT CLAIMS AT ISSUE

Claim 1 of U.S. Patent No. 8,103,865, claim 1 of U.S. Patent No. 8,478,245, and claim 1 of U.S. Patent No. 8,989,715, which are illustrative for purposes of this appeal, are set forth below.

## U.S. Patent No. 8,103,865 – CLAIM 1

A server implemented method for processing data for a wireless device, comprising:

receiving from the wireless device a request for an application program, said request including an indication of a type of wireless device;

executing, in response to receiving said request, said application program to generate a wireless device generic template including a plurality of content items;

sending a custom configuration to the wireless device, said custom configuration being specific to said application program;

generating a page description based on said wireless device generic template and a capability of the wireless device, said page description having at least one discrete low level rendering command that is within said rendering capability of said wireless device but that is of a syntax that is wireless device generic; and

sending said page description to the wireless device such that the wireless device is capable of presenting at least one content item from said plurality of content items using both said page description and said custom configuration.

## U.S. Patent No. 8,478,245 – CLAIM 1

A method of rendering content on a wireless device, said method comprising:

receiving an identification of a custom configuration of a plurality of rendering blocks of said wireless device, wherein said custom configuration is associated with an application and configures said plurality of rendering blocks to render content in a manner customized to said application;

receiving compiled content generated in part from execution of said application wherein said compiled content comprises render commands expressed in a syntax that is generic to said wireless device;

using a graphical user interface comprising said plurality of rendering blocks to generate renderable content based on said compiled content and said custom configuration; and

rendering said renderable content on said wireless device, wherein said receiving compiled content comprises:

receiving first compiled content specific to a first page of said application; and

receiving second compiled content specific to a second page of said application, wherein said custom configuration is applicable to both said first and second compiled content.

## <u>U.S. Patent No. 8,989,715 – CLAIM 1</u>

A method of generating content that is renderable by a wireless device, said method comprising:

transmitting, to said wireless device, an identification of a custom configuration of a plurality of rendering blocks of said wireless device, wherein said custom configuration is associated with an application and configures said plurality of rendering blocks to render content in a manner customized to said application; and

transmitting, to said wireless device, compiled content comprising (i) first compiled content specific to a first page of said application and (ii) second compiled content specific to a second page of said application, wherein said compiled content is generated in part from execution of said application, wherein said compiled content comprises render commands expressed in a syntax that is generic to said wireless device, and wherein said custom configuration is applicable to said first and second compiled content,

wherein said compiled content and said custom configuration are usable by a graphical user interface comprising said plurality of rendering blocks to generate renderable content based on said compiled content and said custom configuration.

# CERTIFICATE OF INTEREST

Counsel for Defendant-Cross-Appellant Netflix, Inc. certifies the following:

**1.    Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Netflix, Inc.

**2.    Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.    Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

WILLKIE FARR AND GALLAGHER LLP:  Steven J. Ballew, Koren L Bell, Barrington E. Dyer, John C. Moulder, Shelby Anissa Palmer, Eric L. Saunders

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X]  Yes (file separate notice; see below)   [ ]  No   [ ]  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

Already filed.

**6.     Organizational Victims and Bankruptcy Cases**.  Provide any
information required under Fed. R. App. P. 26.1(b) (organizational victims in
criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R.
47.4(a)(6).

None.

Dated:  August 21, 2024                    /s/ Thomas G. Saunders
                                                    THOMAS G. SAUNDERS
                                                    WILMER CUTLER PICKERING
                                                       HALE AND DORR LLP
                                                    2100 Pennsylvania Avenue, NW
                                                    Washington, DC  20037
                                                    (202) 663-6000

# TABLE OF CONTENTS

Page

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST ...................................................................i

STATEMENT OF RELATED CASES ..................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 1

INTRODUCTION ..................................................................................... 2

STATEMENT OF ISSUES ON APPEAL ................................................ 4

STATEMENT OF ISSUES ON CROSS-APPEAL ................................. 5

STATEMENT OF THE CASE ................................................................. 5

    A.    The Asserted Patents and Accused Products ........................ 5

        1.    Netflix Streaming Media Platform ............................ 5

        2.    The Asserted Patents................................................... 5

    B.    District Court Proceedings .................................................. 10

        1.    Dismissal of Induced Infringement Claims ............. 10

        2.    Judgment on the Pleadings........................................ 12

        3.    The Parties' Stipulations .......................................... 12

        4.    Summary Judgment ................................................... 13

        5.    Pretrial Motions........................................................ 13

        6.    Trial .......................................................................... 14

            a.    The Parties' Damages Theories...................... 14

            b.    The Learfield Agreement................................ 15

   c.  Other Phunware Licenses ............................................... 16

   d.  Opportunity Cost ........................................................ 17

   e.  2023 Phunware Pricing Model ..................................... 18

   f.  Netflix Licenses ........................................................... 19

   g.  Netflix Licensing Practices.......................................... 19

  7.  Verdict ................................................................................ 20

  8.  Post-Trial Motions .............................................................. 20

SUMMARY OF THE ARGUMENT .................................................... 21

SUMMARY OF THE CROSS-APPEAL ARGUMENT ....................... 23

STANDARD OF REVIEW ................................................................. 24

ARGUMENT ..................................................................................... 24

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION OR
PREJUDICE GOTV BY DENYING GOTV'S MOTIONS IN *LIMINE*
AND *DAUBERT* MOTIONS.................................................................. 24

  A. GoTV Never Objected To The District Court's Single-
Word Rulings, Which Impacted Both Parties Equally ...................... 24

  B. The Limited Use Of The Ten Netflix Licenses To Show
Netflix's Licensing Preferences Did Not Prejudice GoTV................ 26

   1. Ms. Bennis Accounted For The Circumstances Of
The Ten Netflix Licenses By Using Them Solely
To Confirm Netflix's Preference For Lump-Sum
Royalties.................................................................................. 26

   2. The District Court Did Not Abuse Its Discretion
By Finding That GoTV Was Not Prejudiced By
The Limited Use Of The Ten Netflix Licenses At
Trial ........................................................................................ 29

C. The District Court Did Not Abuse Its Discretion In Denying GoTV's Motions Regarding The Comparable Netflix Licenses ...................................................................32

    1. Dr. Villasenor Sufficiently Analyzed the Technology Covered By The Netflix Sound View and R2 Licenses .......................................32

    2. Ms. Bennis Sufficiently Analyzed The Economic Comparability Of The Comparable Netflix Licenses...........................................................34

D. The District Court Did Not Abuse Its Discretion By Allowing Netflix's Expert Opinions Regarding The Phunware Development Agreements ...................38

    1. Dr. Villasenor Sufficiently Analyzed Technological Comparability....................................38

    2. Ms. Bennis Sufficiently Accounted For The Differences Between The Phunware Agreements And A License For The Asserted Patents.................................39

E. The District Court Did Not Abuse Its Discretion In Allowing Ms. Bennis's Opinions Regarding The Phunware Pricing Model....................................41

II. GoTV Is Not Entitled To Further Proceedings On Infringement .................................................................42

A. The Jury's Lump-Sum Damages Award Fully Compensated GoTV For Any Alleged Infringement..........................42

B. GoTV Is Not Entitled To A Remand On Induced Infringement .........................................................44

    1. There Is Nothing To Litigate On Inducement ..........................44

    2. GoTV's Original Complaint Could Not Create An Induced Infringement Claim......................................47

        3.     GoTV's Inducement Allegations Were Insufficient ................. 52

   C.   The District Court Properly Determined That The Claims Of The '865 Patent Are Indefinite ....................................... 54

        1.     The District Court Correctly Determined That The Claims Of The '865 Patent Are Indefinite ............................... 54

        2.     The District Court Correctly Rejected GoTV's Construction Of "Discrete Low Level Rendering Command" ...................................................................... 57

        3.     Even If This Court Disagrees, GoTV Would Not Be Entitled To A Remand ......................................... 62

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY LIMITING GOTV'S PRE-JUDGMENT INTEREST TO THE ACTUAL DAMAGES PERIOD .................................................................... 63

CROSS-APPEAL ...................................................................... 68

I.  THE ASSERTED PATENTS ARE DIRECTED TO INELIGIBLE SUBJECT MATTER ............................................................................. 68

   A.  *Alice* Step 1: The Asserted Patents Are Directed To An Abstract Idea ........................................................... 68

   B.  *Alice* Step 2: The Claims Recite Routine, Conventional Activity Implemented Using Off-The-Shelf Components ................. 75

CONCLUSION ........................................................................ 76

ADDENDUM

CERTIFICATE OF COMPLIANCE

**Confidential Material Omitted**

The material omitted from pages 12 and 47 contain redactions to remove sensitive business information regarding Netflix Operations.

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acceleron, LLC v. Dell Inc.*, 2022 WL 1087683 (N.D. Ga. Mar. 7, 2022), *aff'd Accleron, LLC v. Dell, Inc.*, 2023 WL 4503189 (Fed. Cir. July 13, 2023) ................................................................. 64

*Acceleron, LLC v. Dell Inc.*,
2022 WL 3567222 (Fed. Cir. July 29, 2022) ............................... 65

*Adasa Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ........................................ 28, 29, 34

*Addiction & Detoxification Institute L.L.C. v. Carpenter*,
620 F. App'x 934 (Fed. Cir. 2015) ............................................. 53

*Affinity Labs of Texas v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016) ................................................. 74

*AI Visualize, Inc. v. Nuance Communications, Inc.*,
97 F.4th 1371 (Fed. Cir. 2024) ............................................ 69, 73

*Alice Corp. Party Ltd. v. CLS Banks International*,
573 U.S. 208 (2014) .................................................................. 68

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964) .................................................................. 45

*Audatex North America, Inc. v. Mitchell International Inc.*,
703 F. App'x 986 (Fed. Cir. 2017) ............................................. 75

*Bayer CropScience AG v. Dow AgroSciences LLC*,
851 F.3d 1302 (Fed. Cir. 2017) ................................................. 63

*Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*,
807 F.2d 964 (Fed. Cir. 1986) ................................................... 66

*Bluebonnet Internet Media Services, LLC v. Pandora Media, LLC*,
2024 WL 1338940 (Fed. Cir. 2024) ...................................... 69, 74

*Caselas, LLC v. Verifone, Inc.*,
    2024 WL 2720092 (Fed. Cir. 2024) ............................................................73

*City of Pomona v. SQM North Am. Corp.*,
    866 F.3d 1060 (9th Cir. 2017) ..............................................................24, 25

*E-Vision Optics, LLC v. Luxottica Gro. S.p.A.*,
    2024 WL 3468839 (C.D. Cal. June 11, 2024)..............................................48

*Electric Power Grp. v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ..........................................................71, 76

*Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000) ..................................................................59

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
    909 F.3d 398 (Fed. Cir. 2018) ....................................................................43

*Eolas Technologies Inc. v. Amazon.com, Inc.*,
    2024 WL 371959 (Fed. Cir. 2024)........................................69, 70, 71, 75

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ..................................................................32

*Exmark Manufacturing Company v. Briggs & Stratton Power
    Products Group*, 879 F.3d 1332 (Fed. Cir. 2018) ......................................40

*FairWarning IP, LLC v. Iatric Systems, Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016) ..................................................................74

*Finalrod IP, LLC v. John Crane, Inc.*,
    838 F. App'x 562 (Fed. Cir. 2021) ..............................................................26

*General Motors Corp. v. Devex Corp.*,
    461 U.S. 648 (1983)......................................................................................66

*Glenayre Electronics, Inc. v. Jackson*,
    443 F.3d 851 (Fed. Cir. 2006) ....................................................................45

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)......................................................................................53

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir 2010) ........................................................60

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009) .....................................................61

*Impact Engine, Inc. v. Google LLC*,
    2024 WL 3287126 (Fed. Cir. July 3, 2024) ..................................74

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Electronics Co.*,
    2017 WL 1716589 (E.D. Tex. Apr. 27, 2017) ...............................65

*In re Bill of Lading Transmission & Processing System Patent*
    *Litigation*, 681 F.3d 1323 (Fed. Cir. 2012) .......................49, 53, 54

*Intellectual Ventures I LLC v. Capital One Bank*,
    792 F.3d 1363 (Fed. Cir. 2015) ...............................................74, 75

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) .....................................................76

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) .....................................................55

*Largan Precision Co. v. Genius Electronic Optical Co.*,
    646 Fed. App'x 946 (Fed. Cir. 2016) ............................................53

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ...................................................45, 66

*Microsoft Corp. v. DataTern, Inc.*,
    755 F.3d 899 (Fed. Cir. 2014) .......................................................48

*Miller Mendel, Inc. v. City of Anna, Texas*,
    107 F.4th 1345 (Fed. Cir. 2024) ...................................................74

*Nickson Industries, Inc. v. Rol Manufacturing Co., Ltd.*,
    847 F.2d 795 (Fed. Cir. 1988) ................................................63, 64

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) .......................................................24

*Omega Pats., LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ....................................................36

*Opticurrent, LLC v. Power Integrations, Inc.*, 2019 WL 2389150
(N.D. Cal. June 5, 2019), *aff'd*, 815 F. App'x 547 (Fed. Cir.
2020) ......................................................................................65

*PersonalWeb Technologies LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ......................................................24

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ......................................................38

*SAP America, Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ....................................................24

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
959 F.3d 1076 (Fed. Cir. 2020) ....................................................66

*Sesonics, Inc. v. Aerosonic Corp.*,
81 F.3d 1566 (Fed. Cir. 1996) ......................................................67

*Summit 6, LLC v. Samsung Electronics Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ....................................................43

*Tekmax, Inc. v. Exide Corp.*,
215 F.3d 1339 (Fed. Cir. 1999) ....................................................64

*Texas Instruments Inc. v. ITC*,
988 F.2d 1165 (Fed. Cir. 1993) ....................................................61

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023) ....................................................24

*Trustees of Boston University v. Everlight Electronics Co.*,
187 F. Supp. 3d 306 (D. Mass. 2016).............................................65

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ....................................................71

*United States v. Bacon*,
979 F.3d 766 (9th Cir. 2020) ........................................................26

*Unwired Planet, LLC v. Apple Inc.*,
  829 F.3d 1353 (Fed. Cir. 2016) ....................................................53

*VLSI Technology LLC v. Intel Corp.*,
  2023 WL 8654391 (N.D. Cal. Dec. 14, 2023) ..............................49

*Voice Tech Corp. v. Unified Patents, LLC*,
  __ F.4th__, 2024 WL 3611584 (Fed. Cir. 2024)..........................62

*Wagner v. County of Maricopa*,
  747 F.3d 1048 (9th Cir. 2013) ......................................................24

*Wasica Finance GmbH v. Continental Auto Systems Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) ....................................................60

*WCM Industries, Inc. v. IPS Corp.*,
  721 F. App'x 959 (Fed. Cir. 2018) ...............................................50

*Wordtech Systems, Inc. v. Integrated Network Solutions, Inc.*,
  609 F.3d 1308 (Fed. 2010) ...........................................................35

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
  528 F. Supp. 3d 247, 251 (D. Del. 2021) .....................................48

## STATUTES, RULES, AND REGULATIONS

35 U.S.C. § 101 ..............................................................4, 5, 12, 68

35 U.S.C. § 151 ...........................................................................52

35 U.S.C. § 154(b)(1)(A)(iv) .......................................................52

35 U.S.C. § 286 ...........................................................................66

## STATEMENT OF RELATED CASES

No other appeal in or from the same district court proceeding has been before this or any other appellate court.

This appeal concerns GoTV Streaming, LLC's ("GoTV") assertion of U.S. Patent No. 8,103,865 (the "'865 patent"), U.S. Patent No. 8,478,245 (the "'245 patent"), and U.S. Patent No. 8,989,715 (the "'715 patent"). The '715 patent is at issue in *Netflix, Inc. v. GoTV Streaming, LLC*, IPR2023-00757 (P.T.A.B.) and USPTO Ex Parte Re-Examination No. 90/019,276 (U.S.P.T.O). The '245 patent is at issue in *Netflix, Inc. v. GoTV Streaming, LLC*, IPR2023-00758 (P.T.A.B.) and USPTO Ex Parte Re-Examination No. 90/019,277 (U.S.P.T.O). The '865 Patent is at issue in *Netflix, Inc. v. GoTV Streaming, LLC*, IPR2023-00759 (P.T.A.B.).

Counsel for Netflix, Inc. ("Netflix") know of no other case pending in this or any other court that may affect or be directly affected by this case.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a). The court entered final judgment on January 16, 2024, and ruled on Rule 50(b) and new trial motions on March 26, 2024. Appx97-98; Appx104-116. GoTV filed a notice of appeal on April 4, 2024. Appx11864-11866. Netflix filed a timely cross-appeal on April 19, 2024. Appx11867-11869. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

# INTRODUCTION

Unhappy with the jury's $2.5 million lump-sum award, GoTV is attempting to get a second bite at the apple on damages through a combination of forfeited and meritless arguments. But GoTV's direct attacks on the damages award fail, and its indirect strategy of reaching back to attempt to revive earlier-dismissed claims and inducement theories is not only wrong on the law but ultimately irrelevant given the jury's award, which precludes GoTV from seeking any additional damages. The jury has spoken, and although GoTV is evidently disappointed that the jury did not accept its strained and inflated damages theory, none of GoTV's arguments provides a basis for GoTV to receive further relief.

The district court acted well within its discretion in rejecting GoTV's direct challenges to the damages award. The challenged evidentiary rulings were correct, and the district court's assessment that there was no prejudice in any event is entitled to substantial deference. GoTV's first-time challenge to the district court's use of single-word orders to deny its *Daubert* motions on damages also fails. Unlike in the case it relies on, GoTV never objected to the use of single-word orders. GoTV also neglects to mention the additional explanation the district court provided here, or the fact that its challenge implicates all the motions in limine that were denied, including Netflix's motions challenging the heart of GoTV's case.

Unable to show any error in the damages award, GoTV attempts to revive its induced infringement claims and indefinite '865 patent in an effort to seek more damages. But GoTV's damages expert repeatedly explained that the reasonable royalty would not change based on the number of patents found to be infringed because the benefit to Netflix from one, or all, of the '865, '245, and '715 patents (together "Asserted Patents") would be the same. Thus, the jury's lump-sum damages award fully compensated GoTV for any use of the Asserted Patents by Netflix, and GoTV would be entitled to no further remedy even if it could revive its inducement theory and its indefinite claims.

In any event, there is nothing to revive. The district correctly held that a plaintiff should not be able to manufacture induced infringement claims merely by filing a complaint alleging direct infringement, and even if the rule were otherwise, GoTV failed to plausibly allege that Netflix had the specific intent to induce infringement. GoTV's attempt to resuscitate the '865 patent also fails because a skilled artisan would not reasonably understand the scope of the term "discrete low level rendering command." All of GoTV's purported evidence to the contrary relates to "basic commands," which its expert conceded are not the same thing as "discrete low level rendering commands," and the district court correctly rejected GoTV's construction, which would improperly cause claim language to become superfluous.

GoTV also cannot double its damages award by seeking pre-suit interest despite having waived pre-suit damages. The district court's decision to limit GoTV's interest to the damages period was not an abuse of discretion, and this Court has previously affirmed such awards.

Finally, all of GoTV's arguments are ultimately moot because, on Netflix's cross-appeal, this Court should hold that the claims of the Asserted Patents are invalid under 35 U.S.C. § 101. The claims are directed to the abstract idea of presenting data from a server on a wireless device based on information about that device. Further, the claims lack an inventive concept and are instead implemented using conventional computer technologies and off-the-shelf components.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court acted withing its discretion in denying GoTV's motions *in limine*, *Daubert* motions, and motion for a new trial on damages.

2. Whether the jury's damages award compensating GoTV eliminates the need for any further proceedings on GoTV's induced infringement claims and the '865 patent, where the jury awarded a lump-sum and GoTV's damages theory did not change based on the number of patents infringed.

3. Whether the district court correctly dismissed GoTV's induced infringement claims for failure adequately to alleged specific intent to infringe.

4.     Whether the district court correctly determined that the claims of the '865 patent are indefinite.

5.     Whether the district court acted within its discretion when it limited the award of pre-judgment interest to the damages period rather than awarding prejudgment interest for the period before GoTV incurred any damages.

## STATEMENT OF ISSUES ON CROSS-APPEAL

1.     Whether the claims of the Asserted Patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

### A.     The Asserted Patents and Accused Products

#### 1.     Netflix Streaming Media Platform

Netflix has been an innovator in the field of video streaming since 2007. Appx2443(¶38).  At that time, customers could stream video through the "Watch Now" option on the Netflix website.  *Id.*  By 2012, Netflix customers could stream video on a range of consumer electronic devices.  *Id.*(¶40).  Today, Netflix's streaming service supports four primary user interface platforms: Web, TV, iOS mobile, and Android mobile.  Appx2438(¶4).

#### 2.     The Asserted Patents

GoTV, which is a non-practicing entity, acquired the asserted patents from Phunware shortly before filing suit against Netflix.  Appx2755-2764.  The alleged

invention claimed in those patents was the product of a different era and was quickly overtaken by other developments. According to GoTV, the claims of the Asserted Patents use an already-existing technology—"distributed architecture"—to relieve software programmers of the need to "develop 40, 50, 60 different apps" for the different devices and operating systems that existed when Phunware filed for patent protection. Appx373-374(9:18-10:21); *see also* Appx179(2:36-39) ("relieve software vendors from tailoring their applications based on each ***wireless device type***").[1] However, by the time of the hypothetical negotiation in this case, consumer devices had largely converged on the use of common platforms—the iOS, Android, TV, and Web platforms—allowing application changes to be implemented on the platform-level rather than the device-level. *See, e.g.*, Appx415(51:8-21); Appx503-504(25:21-26:2); Appx658(180:8-16).

The Asserted Patents have nearly identical specifications and are directed to presenting data from a server on a wireless device based on information about that device.[2] The claims of the '865 and '715 patents are directed to the server side, while the claims of the '245 patent focus on the client-side, i.e., on the wireless device.

---

[1]     All emphasis added unless otherwise indicated.

[2]     The '245 and '715 patents have a different Abstract than the '865 patent. Appx122(Abstract); Appx146 (Abstract); Appx168(Abstract).

On the server-side, a server receives a "message from the wireless device" and accesses a "library of applications" that "contains generic applications that on one level operate regardless of the device type." Appx180(3:7-11). The requested application generates a generic template. *Id.*; Appx180(3:31-43). The server may also "identify a custom configuration to be used for the requested application and device type," where the "custom configuration is the theme and determines certain graphical appearances of the requested application." Appx180(3:12-15). "The server may send a message to the wireless device identifying the custom configuration to be used. If the identified custom configuration is present on the wireless device it is used locally, otherwise the identified custom configuration is downloaded from the server to the wireless device." Appx180(3:17-22).

The server may also generate and send a "page description" to the wireless device. Appx180(3:42-43). The page description can contain "basic commands" that include, for example, "a description of the scrolling area." Appx185(13:26-37).

On the client side, "[t]he wireless device 110 may be any mobile wireless electronic device, e.g., a cellular phone, a personal digital assistant (PDA), a pager, a smart phone, a BlackBerry, a laptop and the like." Appx181(6:3-6). The wireless device performs several high-level functions that mirror the server-side, including "receiv[ing] an identification of a custom configuration,"

7

Appx122(Abstract), "receiv[ing] compiled content," Appx136(7:42-45), and using

a "graphical user interface layer 108." Appx136(7:21-23).

The '865 patent issued on January 24, 2012, from an application filed on

August 1, 2007. Appx168. Claim 1 of the '865 is representative:

> A server implemented method for processing data for a wireless
> device, comprising:
>
> receiving from the wireless device a request for an application
> program, said request including an indication of a type of
> wireless device;
>
> executing, in response to receiving said request, said application
> program to generate a wireless device generic template
> including a plurality of content items;
>
> sending a custom configuration to the wireless device, said custom
> configuration being specific to said application program;
>
> generating a page description based on said wireless device generic
> template and a capability of the wireless device, said page
> description having at least one discrete low level rendering
> command that is within said rendering capability of said
> wireless device but that is of a syntax that is wireless device
> generic; and
>
> sending said page description to the wireless device such that the
> wireless device is capable of presenting at least one content
> item from said plurality of content items using both said page
> description and said custom configuration.

Appx188(20:42-63).

The '245 patent issued on July 2, 2013, from an application filed on August

1, 2007. Appx122. Claim 1 of the '245 patent is representative:

A method of rendering content on a wireless device, said method comprising:

receiving an identification of a custom configuration of a plurality of rendering blocks of said wireless device, wherein said custom configuration is associated with an application and configures said plurality of rendering blocks to render content in a manner customized to said application;

receiving compiled content generated in part from execution of said application wherein said compiled content comprises render commands expressed in a syntax that is generic to said wireless device;

using a graphical user interface comprising said plurality of rendering blocks to generate renderable content based on said compiled content and said custom configuration; and

rendering said renderable content on said wireless device, wherein said receiving compiled content comprises:

receiving first compiled content specific to a first page of said application; and

receiving second compiled content specific to a second page of said application, wherein said custom configuration is applicable to both said first and second compiled content.

Appx142(20:41-64).

The '715 patent issued on March 24, 2015, from an application filed on April 18, 2013. Appx146. The '715 patent is a continuation of the application that issued as the '245 patent. Claim 1 of the '715 patent is representative:

A method of generating content that is renderable by a wireless device, said method comprising:

transmitting, to said wireless device, an identification of a custom configuration of a plurality of rendering blocks of said wireless

9

device, wherein said custom configuration is associated with an application and configures said plurality of rendering blocks to render content in a manner customized to said application; and

transmitting, to said wireless device, compiled content comprising (i) first compiled content specific to a first page of said application and (ii) second compiled content specific to a second page of said application, wherein said compiled content is generated in part from execution of said application, wherein said compiled content comprises render commands expressed in a syntax that is generic to said wireless device, and wherein said custom configuration is applicable to said first and second compiled content,

wherein said compiled content and said custom configuration are usable by a graphical user interface comprising said plurality of rendering blocks to generate renderable content based on said compiled content and said custom configuration.

Appx166(20:40-62).

## B. District Court Proceedings

### 1. Dismissal of Induced Infringement Claims

On October 17, 2022, GoTV filed a complaint ("Original Complaint") alleging that Netflix directly infringes the Asserted Patents. Appx934-979. GoTV did not serve the complaint until October 25, 2022. *See* Appx12157.

On November 10, 2022, GoTV filed an amended complaint ("FAC"), adding induced infringement claims. Appx980-1029. With respect to the '245 patent, GoTV alleged that Netflix induced infringement "by its customers through the Netflix application running on such customer's [sic] wireless devices." Appx1012-1013(¶63). With respect to the '865 and '715 patents, GoTV alleged that Netflix

induces infringement "by its cloud computing providers and by any IXP/ISP companies." Appx999(¶38); Appx1026(¶86).

GoTV alleged that Netflix had knowledge of the Asserted Patents and alleged infringement based solely on the filing of GoTV's Original Complaint that was served only 16 days earlier. Appx999-1000(¶39); Appx1013(¶64); Appx1026(¶87). While GoTV referenced "willful blindness" in passing, GoTV pleaded no facts supporting this allegation. Appx1000(¶40); Appx1013(¶65); Appx1026(¶88).

Netflix moved to dismiss the induced infringement claims. Appx1030-1032. The district court granted the motion, holding that "'a plaintiff must allege in an original complaint that the alleged inducer had knowledge of the patent-in-suit prior to filing,' as '[t]he purpose of a complaint is to obtain relief from an existing claim and not to create a claim.'" Appx3 (citation omitted). The Court further explained that "ambushing defendants" with induced infringement claims in a complaint "instead of typical cease-and-desist letters would effectively deny defendants the opportunity to meaningfully evaluate and potentially cease the allegedly infringing conduct in order to avoid liability for induced infringement." Appx3-4.

The Court granted GoTV leave to amend, but GoTV did not amend its allegations. Appx41. Nor did GoTV provide notice of the patents and alleged

infringement outside the context of litigation and then file a new complaint alleging inducement.

### 2.    Judgment on the Pleadings

Netflix moved for judgment on the pleadings that the claims of the Asserted Patents are ineligible under 35 U.S.C. § 101.  Appx1216-1218.  The court determined on *Alice* Step 1 that the claims were "directed to specific improvements in computer capabilities rather than an abstract idea."  Appx46-47.  The court confirmed that its denial of Netflix's motion on the pleadings "constitute[d] the Court's judgment as a matter of law that the claims of the Asserted Patents are not invalid under 35 U.S.C. § 101 and conclusively resolves Section 101 issues for purposes of this case."  Appx78.

### 3.    The Parties' Stipulations

During discovery, the parties jointly stipulated that, for purposes of this litigation only, ███████ entity ███████ and Netflix's ███ entity ███ ███████ do not ███████ function ███████.  *See* Appx12159.

Separately, in response to Netflix's motion seeking judgment on the pleadings of no pre-suit damages, GoTV stipulated that it would not seek pre-suit damages.  Appx1405-1406.

### 4.    Summary Judgment

Netflix moved for summary judgment that the claims of the '865 patent were indefinite because a skilled artisan would not reasonably understand the scope of the term "low level rendering commands." Appx1712. The district court granted Netflix's motion. Appx56. The court determined that GoTV's proposed "construction fails because it renders significant portions of the specification and claims to be superfluous." Appx55. The court also determined that there was no "guidance from the patent, its prosecution history, or the relevant art" as to the meaning of this term and the claims were therefore indefinite. Appx56.

### 5.    Pretrial Motions

Both parties filed motions seeking to exclude testimony from the other side's experts. For example, Netflix explained that that GoTV's damages expert, Stephen Dell, relied on a software license, the Learfield agreement, that was technically and economically incomparable to the patent license the parties would have agreed to and performed an improper "cost savings analysis" based on Netflix's expenditures to operate its allegedly infringing system. Appx6936-6937. Netflix also sought to exclude the opinions of GoTV's technical expert, Dr. Malek, because, for example, he conducted no independent analysis of the application licensed by the Learfield Application to support his opinion that it practices the Asserted Patents. Appx7330-7331.

The Court ruled on both parties' *Daubert* motions, as well as all motions *in limine*, using single-word rulings. Appx71-72; Appx80; Appx298-299. Neither party objected to the absence of additional explanation.

### 6. Trial

#### a. *The Parties' Damages Theories*

At trial, the parties agreed that the hypothetical negotiation would have taken place in July 2013, and would have been between Netflix and a company called Phunware, which owned the Asserted Patents at the time. Appx591-592(113:12-114:3).[3]

GoTV's damages expert, Mr. Dell, opined that GoTV was entitled to a running royalty of "four cents per paid subscriber" for "total running royalty damages of $35,184,480." Appx585(107:7-9). Mr. Dell told the jury that the "royalty rate would be the same … whether it was either one or both of the patents

---

[3] Before the '865 patent was held to be indefinite, the hypothetical negotiation date was in 2012. Appx5496. Mr. Dell did not change his damages opinion when the '865 patent was invalidated and the hypothetical negotiation date changed. Appx6985 (damages computation for all three Asserted Patents); Appx585(107:7-9) (damages computation for '865 and '245 patents); Appx12163-12164(¶¶6-9) ("[I]t is my opinion that the outcome of the July 2013 hypothetical negotiation date would be the same as the outcome of the previous January 2012 hypothetical negotiation date due to the fact that the parties to the hypothetical negotiation would remain the same and would be similarly situated from an economic perspective.").

at issue [i.e., the '245 and '715 patents], because the benefits from Netflix's use of both of those patents are the same." Appx621(143:19-22). Mr. Dell's royalty calculation primarily relied on (1) non-patent licenses from Phunware, including the Learfield Agreement, and (2) Netflix's purported "cost savings" from the alleged infringement. Appx607-621(129:3-143:13).

Netflix's damages expert, Melissa Bennis, explained that the parties would have "agreed to a one-time lump-sum payment of between $500,000 and $1.7 million." Appx775(10:3-7). Ms. Bennis's calculation was based on the same "Phunware software agreements" considered by Mr. Dell, Phunware's "pricing model," and comparable Netflix agreements "for similar technology." Appx775-776(10:22-11:10).

### b. *The Learfield Agreement*

Mr. Dell conceded that Phunware never licensed the Asserted Patents. Appx626-627(148:13-149:6). He therefore relied on several Phunware development agreements, including the Learfield agreement, which governed the development and support of a mobile application that used Phunware's MaaS software. Appx12191.

In order to calculate the starting point for his royalty, Mr. Dell used the Learfield Agreement's highest rate—$10,000/month for licensing the MaaS software for 500,000-1,000,000 active users. Appx608(130:8-10); Appx12197.

Mr. Dell converted this fee to a "one-cent royalty rate" per user. Appx608(130:16-22). Mr. Dell then divided this rate in half based on Dr. Malek's testimony that, of the four MaaS software components licensed by the Learfield Agreement, only the "Maas Content Management" component was comparable to the Asserted Patents and "was at least equally as valuable technologically as the other components after you remove the two components that we'd been giving away for free or not used." Appx609(131:9-16). Finally, Mr. Dell multiplied this $0.005 rate by his own estimate of the number of devices used per-subscriber-per-month to get a per-month rate of $0.02-0.04. Appx610-611(132:4-133:9).

Ms. Bennis explained why the parties would not have agreed to Mr. Dell's royalty, including because the Learfield application had "a host of different payment terms." Appx777(12:13-18). She also demonstrated that the Learfield Agreement did not "set a per subscriber rate" as Mr. Dell contended, but rather "set $4,000 per month for unlimited users." Appx778(13:1-7). Further, she identified several "errors in the inputs Mr. Dell uses in his calculation," including his $0.01 calculation, 50% apportionment, and approximation of devices per-user-per-month. Appx778-783(13:19-18:6).

### c. Other Phunware Licenses

Mr. Dell found several other Phunware development agreements relevant. Appx611(133:14-21). Mr. Dell did not use these agreements "directly for the

rate," but as "evidence of" of how Phunware "would license its technology." Appx612(134:4-12). However, he acknowledged that none of these Phunware agreements used a "per-user fee." Appx637-638(159:14-160:3).

Ms. Bennis relied on these same Phunware licenses, which contained "an up-front application development-type fee" as well as maintenance, support, and subscription fees. Appx789(24:20-24). Ms. Bennis "took the per platform software development fee from each of those licenses" and adjusted them to reflect the fact that "Netflix had four platforms," resulting in "up-front software development fees ranging from 222,000 up to 800,000 in total." Appx790-791(25:21-26:2). Her "reasonable royalty of 500,000 on the low end" was "essentially the average" of these fees. Appx791(26:3-6).

Finally, Ms. Bennis "look[ed] at the agreements in total" even though they were "for [Phunware's] full suite of software." Appx791(26:7-21). She "rightsized the terms of those agreements over the term that would be the Netflix license and brought those back to present day dollars" to get a "range of total payments" of "835,000 up to 2.8 million," for an average of about $1.7 million. Appx791(26:13-21).

### d. Opportunity Cost

Mr. Dell also relied on a purported "opportunity cost" to Phunware based on "the revenue that Phunware would charge for its services if it was going to provide

that to Netflix." Appx616-619(138:11-141:1). However, Mr. Dell conceded that at the time of the hypothetical negotiation, "Netflix had already built its streaming system and its homepage with its own time and money." Appx627(149:19-25).

Ms. Bennis explained that Mr. Dell's analysis was not a true cost savings analysis because it measured Netflix costs that had "already been incurred." Appx784(19:3-14). Ms. Bennis additionally opined that Mr. Dell's labor estimate was "way overstated." Appx785(20:8-10).

### e.    *2023 Phunware Pricing Model*

Ms. Bennis relied on a 2023 Pricing Model from the Phunware website to contextualize Mr. Dell's $35,000,000 royalty. Ms. Bennis explained that Phunware never charged "anything close to $35,000,000 for similar technology or even for a whole suite of software in a one-year period." Appx774(9:8-24). In fact, "Phunware is still on the market charging … between $50,000 and $200,000 per platform" for the MaaS software identified by GoTV's experts as comparable to the Asserted Patents. *Id.*

She additionally used the 2023 Phunware Pricing Model as a reasonableness check on her $1.7 million royalty upper bound, explaining that "over a three-to-five-year period, the typical deal size is said to be 1.75 million." Appx791-792(26:25-27:10).

### f. *Netflix Licenses*

Netflix produced a total of 13 licenses.  Mr. Dell discounted these licenses because "many if not all of the agreements" were settlement agreements. Appx605-606(127:21-128:3).  However, Ms. Bennis opined that three of the Netflix licenses, the Hot Pepper, Sound View, and R2 licenses (together "Comparable Netflix Licenses"), were comparable to a license for the Asserted Patents because she understood that they "contained patents that were deemed the most similar, technologically."  Appx792(27:14-25).  As explained in Ms. Bennis's report, this understanding was based on the opinions of Netflix's technical expert, Dr. Villasenor, regarding technological comparability.  Appx5539-5542.  Ms. Bennis told the jury that the Comparable Netflix Licenses were "for one-time, up-front payments of between $10,000 and just under $2 million."  Appx792(27:14-25).

Ms. Bennis did not rely on the remaining ten Netflix licenses (together "Ten Netflix Licenses") to calculate her reasonable royalty.  Appx792(27:14-25).

### g. *Netflix Licensing Practices*

Mr. Dell relied on testimony from Mr. Rich Butler, a corporate representative of Netflix, to conclude that "Netflix did not have a policy that would preclude it from entering into an agreement on a running royalty basis." Appx593(115:9-13).  However, Mr. Dell acknowledged that he reviewed "all of

the agreements that Netflix produced," and that "not a single one of these payments was more than $2 million" and all had a "lump-sum structure, not a running royalty structure." Appx631-633(153:14-155:14). Mr. Dell also acknowledged that Mr. Butler was "not aware of a single example of Netflix having agreed to a running royalty." Appx635-637(157:11-159:8).

Ms. Bennis responded to Mr. Dell's theory by pointing out that the 13 Netflix licenses in the record were "all lump-sum agreements." Appx792(27:14-22).

### 7. Verdict

The jury found that Netflix infringed claim 4 of the '715 patent, but did not infringe claim 16 of the '245 patent. Appx9980. The jury adopted neither party's damages calculation and instead awarded $2,500,000 in lump sum damages. Appx9981.

### 8. Post-Trial Motions

As relevant here, GoTV moved for a new trial on damages. GoTV challenged Netflix's demonstrative that briefly showed the terms of the Ten Netflix Licenses during the cross-examination of Mr. Dell, as well as "related testimony." Appx11374. GoTV also argued that Ms. Bennis' testimony "regarding the six Phunware agreements and the three Netflix agreements was both improper and unduly prejudicial" because she had relied on the technological comparability

opinions that Dr. Villasenor had included in his report but did not repeat during his limited time at trial. Appx11379-11381. Finally, GoTV challenged Netflix's use of the 2023 Phunware Rate Sheet. Appx11381-11384

The district court denied GoTV's motion. Appx111. The district court found that GoTV was not prejudiced by the limited reference to the Ten Netflix Licenses. Appx109. Further, with respect to the Comparable Netflix Licenses, Phunware licenses, and Phunware Rate Sheet, GoTV never objected to the relevant testimony, and the "jury was free to consider" this evidence. Appx110-111.

## SUMMARY OF THE ARGUMENT

I.    The district court did not abuse its discretion by denying GoTV's evidentiary motions relating to damages. Before the district court, GoTV never objected to the use of single-word orders to deny its motions. Further, the district court denied both parties' motions using single-word orders and any remedy provided by this Court should therefore be applied to all single-word rulings, including the denials of Netflix's motions.

The district court did not abuse its discretion in denying GoTV's motions. Nearly all of the evidence challenged by GoTV was used solely to rebut GoTV's theory that the parties would rely solely on a single non-patent software license with materially different terms than all other licenses in the record. Further, Netflix's experts sufficiently performed baseline comparability analyses of the

licenses in the record such that any remaining dispute went to the weight of the evidence and not its admissibility.

II.     The jury's lump-sum damages award fully compensates GoTV for any alleged use of the Asserted Patents by Netflix.  Thus, GoTV would not be entitled to any further infringement proceedings against Netflix even if this Court disagrees with the district court's rulings with respect to inducement and indefiniteness.

III.     In any event, the district court did not err in dismissing GoTV's induced infringement claims.  A plaintiff cannot use the direct infringement allegations in its complaint to manufacture induced infringement claims that did not exist pre-filing.  Holding otherwise would subject nearly every defendant to induced infringement claims and would waste judicial resources by disincentivizing pre-suit notice letters.  But even if the allegations in a complaint could sometimes give rise to inducement claims, the district court's dismissal of GoTV's claims should be affirmed because GoTV did not sufficiently plead that Netflix had specific intent to encourage infringement of the Asserted Patents or that Netflix was willfully blind to such infringement.

IV.     The district court correctly concluded that the claims of the '865 Patent are indefinite.  GoTV identifies no evidence that a skilled artisan would reasonably understand the scope of "discrete low level rendering command."

Instead, GoTV points solely to disclosures in the specification regarding "basic commands," but GoTV's expert conceded that basic commands are not the same thing as "discrete low level rendering commands." Further, GoTV's proposed construction improperly renders significant portions of claim 1 of the '865 patent superfluous. Accordingly, GoTV's construction is disfavored and the district court's ruling should be affirmed.

V.     It was not an abuse of discretion for the district court to limit GoTV's pre-judgment interest to the time period for which damages were actually available. GoTV had expressly waived pre-suit damages, and the district court properly tied its interest calculation to the nature of GoTV's award.

## SUMMARY OF THE CROSS-APPEAL ARGUMENT

The district court went astray by finding that the Asserted Patents claim specific improvements in computer capabilities. The claims of the Asserted Patents are directed to the abstract idea of presenting data from a server on a wireless device based on information about that device. Further, the elements of the claims do not provide an inventive concept sufficient to transform this abstract idea into a patent eligible subject matter. This Court should therefore hold that the claims of the Asserted Patents are invalid, or, at minimum, that the validity analysis cannot stop at *Alice* Step 1.

**STANDARD OF REVIEW**

This Court applies the procedural law of the regional circuit. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1314 (Fed. Cir. 2021). The Ninth Circuit reviews evidentiary rulings for abuse of discretion. *Wagner v. Cnty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013). The Ninth Circuit reviews the grant or denial of a motion to dismiss or a motion for judgment on the pleadings de novo. *See Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360 (Fed. Cir. 2023).

A district court's grant of prejudgment interest is reviewed for an abuse of discretion. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996).

Patent subject matter eligibility "is a question of law, based on underlying facts." *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).

**ARGUMENT**

I.    **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION OR PREJUDICE GOTV BY DENYING GOTV'S MOTIONS IN *LIMINE* AND *DAUBERT* MOTIONS**

A.    **GoTV Never Objected To The District Court's Single-Word Rulings, Which Impacted Both Parties Equally**

On appeal, GoTV for the first time objects to the district court's use of single-word orders to deny its evidentiary motions. GoTV Br. 35. In support, GoTV points to *City of Pomona v. SQM North America Corp.*, 866 F.3d 1060 (9th Cir. 2017). GoTV Br. 35. But the plaintiff in *City of Pomona* raised its concern regarding the district court's single-word denials immediately after the district

court's tentative rulings. *See City of Pomona*, 2:11-cv-00167, Dkt. 202 at 21:24-22:7 (C.D. Cal. Jan. 4, 2012) (raising "denials without any basis"); *id.* at 24:8-25:17 (raising single-word denial of plaintiff's third motion *in limine*). By contrast, GoTV never objected to, or requested further explanation for, the district court's rulings and therefore forfeited its challenge.

Further, unlike in *City of Pomona*, the district court **did** clarify the basis for its ruling with respect to GoTV's motion to exclude Ms. Bennis's testimony on comparable licenses. Specifically, in denying GoTV's motion for a new trial on damages, the court explained that it had denied the motion because it "appeared that Defendant could present enough evidence that any dispute over [license] comparability went 'to the weight of the evidence, not its admissibility.'" Appx110(n.3) (citation omitted). Thus, at minimum, the district court's initial use of a single-word ruling with respect to this motion was indisputably harmless.

GoTV also neglects to mention that the district court used single-word orders to deny **both** parties' evidentiary motions, i.e., a total of 23 motions. Appx71-75; Appx80. To the extent GoTV believes there was error, it applied equally to the denial of Netflix's motions to exclude the flawed opinions of GoTV's damages and technical experts, including regarding the technologically and economically non-comparable Learfield agreement. *Supra* p. 13. While Netflix does not believe a remand is necessary, if this Court decides that there was

harmful error, any remedy should be applied to all the single-word rulings and not just those identified by GoTV.

In addition to the lack of error, GoTV is incorrect that the proper remedy for allegedly harmful evidentiary rulings is a new trial. Rather, the proper recourse even if there had been an error would be a limited remand to ask the district court to clarify its evidentiary rulings, not a new trial as GoTV suggests. *See United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (holding en banc that a new trial is not always required when a district court commits a non-harmless *Daubert* error). Indeed, this is the approach previously followed by this Court. *Finalrod IP, LLC v. John Crane, Inc.*, 838 F. App'x 562, 564 (Fed. Cir. 2021) ("[T]he appropriate course of action is to vacate the district court's exclusion of such testimony and remand for the court to 'examine afresh the admissibility of [the] expert testimony and give reasons for its decision.'"). In any event, no remand is required under these circumstances because, as explained below, the district court did not abuse its discretion by denying GoTV's motions.

**B. The Limited Use Of The Ten Netflix Licenses To Show Netflix's Licensing Preferences Did Not Prejudice GoTV**

**1. Ms. Bennis Accounted For The Circumstances Of The Ten Netflix Licenses By Using Them Solely To Confirm Netflix's Preference For Lump-Sum Royalties**

The district court did not abuse its discretion by permitting Ms. Bennis's opinions regarding the Ten Netflix Licenses. Ms. Bennis relied on these licenses

solely to rebut Mr. Dell's opinion that the parties would have chosen a running royalty structure. Further, there was no prejudice to GoTV because the Ten Netflix Licenses are cumulative of the other record evidence.

Mr. Dell based his damages computation on the Learfield Agreement, a software development agreement that is not a patent license. Appx6997(¶238). Mr. Dell opined that, based on the Learfield Agreement, the parties would have agreed to a per-user running royalty even though *no other license in the record used that structure*. Appx6996-6997(¶237) (Phunware agreements); Appx637-638(158:2-160:3) (Netflix and Phunware licenses).

In response to Mr. Dell's unsupported theory, Ms. Bennis explained that *all* the other evidence in the record supported a lump-sum royalty. Appx5554. For example, she pointed to Phunware's own "preference for upfront software development fees." *Id.* She also explained "that a running royalty based on subscribers would be inappropriate because the primary benefits of the patented invention relate to efficiencies in the software development and maintenance efforts rather than driving demand for Netflix subscriptions." *Id.* Finally, Ms. Bennis noted that all 13 Netflix licenses used a lump-sum royalty. *Id.*; Appx5530-5543. For the Ten Netflix Licenses, Ms. Bennis opined that they were relevant only to confirm Netflix's preference for lump-sum royalties. Appx5530-5543.

Thus, Ms. Bennis's opinion regarding these licenses was offered solely as confirmatory evidence rebutting Mr. Dell's cherry-picked royalty structure.

GoTV nevertheless argues that Ms. Bennis improperly relied on the Ten Netflix License as part of her damages computation. GoTV is wrong for three reasons. *First*, Ms. Bennis did not rely on the Ten Netflix Licenses to support her damages computation. She identified the Ten Netflix Licenses as merely supportive of "the economics of Netflix's licensing preferences," i.e., their general preference for lump sum payments. Appx5530-5539; Appx5543.

GoTV points to Ms. Bennis's statement that "[t]he consideration in the [Ten Netflix Licenses] was structured as lump sum payments, none of which exceeded $2 million." GoTV Br. 36 (quoting Appx5543). But Ms. Bennis did not base her $1.7 million computation on this observation. Appx5554-5555 (relying on the Comparable Netflix Licenses and Phunware agreements). In any event, this statement at most implies that the Ten Netflix Licenses had royalties "within the realm" of the Phunware and Comparable Netflix Licenses and were therefore cumulative of the other record evidence. Appx5833-5834(196:12-197:12).

*Second*, GoTV identifies no case holding that an expert is not permitted to rely on licenses that would not otherwise be technologically comparable for the limited purpose of confirming a parties' preference for a particular royalty structure. GoTV relies solely on *Adasa Inc. v. Avery Dennison Corporation*, 55

28

F.4th 900 (Fed. Cir. 2022). GoTV Br. 37. But *Adasa* did not involve licenses that were proffered solely to confirm the defendant's practice of using a particular royalty structure. Further, consistent with *Adasa*, Ms. Bennis "'account[ed] for differences in the technologies and economic circumstances'" by using the Ten Netflix Licenses solely as confirmatory evidence of Netflix's preference for lump-sum royalties. 55 F.4th at 915 (citation omitted).

*Third*, in contrast to the conclusory testimony at issue in *Adasa*, Ms. Bennis's report provided a thorough analysis of the technological and economic circumstances of the Ten Netflix Licenses. *Compare* Appx5530-5539 (analyzing the Ten Netflix Licenses) *with* 55 F.4th at 915 (comparability analysis consisted of "a single brief paragraph" that characterized technology using "too broad and vague a category").

## 2. The District Court Did Not Abuse Its Discretion By Finding That GoTV Was Not Prejudiced By The Limited Use Of The Ten Netflix Licenses At Trial

The district court did not abuse its discretion by finding that GoTV was not prejudiced by a single demonstrative showing the terms of the Ten Netflix licenses that was briefly used to cross-examine Mr. Dell. Critically, GoTV does not appeal the district court's finding that GoTV was not prejudiced by the limited use of this demonstrative and accompanying argument at trial. Appx108-109. In any event, the district court did not abuse its discretion for three reasons.

*First*, as the district court found, Netflix's demonstrative was only briefly used to cross-examine Mr. Dell on his testimony regarding Netflix's licensing practices. Appx109. Mr. Dell testified that "Netflix did not have a policy that would preclude it from entering into an agreement on a running royalty basis," Appx593(115:9-13), and used the Learfield Agreement as the sole support for the use of a running royalty, Appx607-608(129:3-130:22). Netflix briefly showed a demonstrative with the terms of all thirteen Netflix licenses to cross-examine Mr. Dell's testimony on these points. Appx631-633(153:19-155:9). In total, the demonstrative was visible to the jury for the span of less than two transcript pages. *Id*.

As the district court found, the demonstrative was "displayed and discussed only briefly, in the middle of trial" and was "not the focus of Defendant's damages rebuttal, nor was it discussed in closing, such that one would expect these figures to linger in the jury's mind and taint its verdict." Appx109. GoTV identifies no errors of law or fact in the district court's determination. Rather, GoTV contends that Netflix used this demonstrative, and the Ten Netflix Licenses more generally, "to malign" Mr. Dell's damages model as an outlier. GoTV Br. 43. The testimony on which GoTV relies does not support this suggestion.

Critically, Ms. Bennis's damages calculation was based on the Comparable Netflix Licenses and not the Ten Netflix Licenses. Appx792(27:14-22). Her

testimony regarding the Ten Netflix Licenses was limited to stating that they "were all lump-sum agreements; one-time, up-front, lump-sum agreements." *Id.* Further, when Netflix moved to admit the Ten Netflix Licenses, the district court granted GoTV's objection. Appx794(29:3-10). As a result, the jury did not have access to the licenses during deliberations.

GoTV also takes Ms. Bennis's statement regarding "'the Netflix agreements *that we've heard about*'" out of context. GoTV Br. 46 (emphasis in original). Ms. Bennis made clear to the jury that the licenses with "similar technology," Appx776(11:4-10), were the Comparable License Agreements and not the Ten Netflix Agreements.

GoTV also points to a statement from Netflix's attorney during closing arguments that Netflix has "never done a running royalty license." GoTV Br. 43 (citing Appx881-882). But this statement referred to the testimony of Netflix representative Rich Butler, and not to the Ten Netflix Licenses. Appx881(51:12-23). Nor was Netflix's counsel's passing reference to "Netflix patent licenses" as "fine to consider" remotely prejudicial. Appx882(52:12-15). In context, this statement was plainly in reference to the Comparable Netflix Licenses. *Id.*

*Second*, the district court did not abuse its discretion by finding that GoTV was not prejudiced because "the extent to which the jury relied on this demonstrative appears limited given that the jury awarded $2.5 million—more than

31

the $2 million cap suggested by this demonstrative." Appx109. GoTV does not

challenge this finding on appeal or point to any evidence tying the jury's damages

award to the substantially lower rates of the Ten Netflix Licenses.

*Finally*, the district court did not abuse its discretion in finding lack of

prejudice because "the range of licenses in the demonstrative are largely consistent

with the 'no more than $1.7 million' opinion set forth by the Defendant's damages

expert" and thus "were merely cumulative of Defendant's other evidence."

Appx109. Again, GoTV does not dispute that the licensing terms of the Ten

Netflix Licenses were consistent with the terms of the other licenses at trial.

### C. The District Court Did Not Abuse Its Discretion In Denying GoTV's Motions Regarding The Comparable Netflix Licenses

#### 1. Dr. Villasenor Sufficiently Analyzed the Technology Covered By The Netflix Sound View and R2 Licenses

The district court did not abuse its discretion by denying GoTV's motion to

exclude Dr. Villasenor's analysis of the Netflix Sound View and R2 Licenses

(GoTV Br. 37-38) because Dr. Villasenor's technological comparability analysis

was sufficient to establish baseline technological comparability. *See Ericsson, Inc.*

*v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a

license is not perfectly analogous generally goes to the weight of the evidence, not

its admissibility.").

GoTV identifies no legal or factual basis for reversing the district court's finding. *First*, with respect to the Sound View license, GoTV incorrectly suggests that Dr. Villasenor "merely referenced the ***title*** of a licensed patent." GoTV Br. 38 (emphasis in original). But Dr. Villasenor "reviewed the content of patents relating to content rendering and UIs included in the license to Netflix under the Sound View Agreement." Appx5644(¶286). From this review, he identified U.S. Patent No. 8,645,426 as technologically comparable to the Asserted Patents. *Id.* He then analyzed the substance of the '426 specification, including exemplary figures. Appx5643-5644(¶287).[4]

*Second*, Dr. Villasenor's analysis of the R2 license was also sufficient to establish threshold technological comparability. GoTV accuses Dr. Villasenor of merely "identifying phrases" used in the licensed technology without providing any analysis. GoTV Br. 38. But, read in full, Dr. Villasenor's report properly identified several common features shared between the R2 licensed technology and Asserted Patents, including "a client-server system with the application delivered to the client being automatically modified based on the resources available." Appx5645-5647(¶¶291-292).

---

[4]     In contrast, GoTV's expert, Dr. Malek, conducted a comparability analysis for this license that "consist[ed] of keyword searching the titles of the patents listed in Exhibit 1 of the Sound View Agreement." Appx5642(¶285).

*Third*, because Dr. Villasenor specifically analyzed technology covered by the Sound View and R2 licenses, GoTV's reliance on *Adasa*, GoTV Br. 37-38, fails. In *Adasa*, the expert's analysis was limited to discussing "RFID technology" generally, which was deemed "too broad and vague a category." 55 F.4th at 915. Here, by contrast, Dr. Villasenor looked at the specific technology covered by each license, including references to specific technical features and embodiments. *Supra* p. 33.

In addition to the lack of error, GoTV was not harmed because the jury's $2.5 million award is substantially higher than the $1,990,000 and $450,000 lump-sum royalties of the Sound View and R2 licenses, respectively. Appx10868. Further, the royalties in these two licenses are cumulative of all the other licenses, including the Phunware licenses discussed by both parties' experts, which supported a reasonable royalty of no more than $2.8 million. Appx10850.

### 2. Ms. Bennis Sufficiently Analyzed The Economic Comparability Of The Comparable Netflix Licenses

The district court did not abuse its discretion by declining to exclude Ms. Bennis's opinions regarding the Comparable Netflix Licenses. GoTV contends that Ms. Bennis failed to tie the lump sum rates in the Comparable Netflix Licenses to the facts of the case. GoTV Br. 39. But Ms. Bennis provided a thorough analysis of the Comparable Netflix Licenses, including a discussion of the scope of the rights conferred by each. Appx5539-5543. She then contextualized the royalty

rates in these licenses by looking to the Phunware licenses in the record, which similarly suggested that a reasonable royalty would be a lump-sum payment of "less than $1.8 million."  Appx5555-5557.  The district court did not abuse its discretion by denying GoTV's challenge to these opinions for four reasons.

*First*, GoTV's cited cases (GoTV Br. 39) do not suggest that the district court abused its discretion in finding this analysis sufficient.  In *Wordtech Systems, Inc. v. Integrated Network Solutions, Inc.*, the jury awarded a lump sum royalty, but of the "thirteen licenses, only two were lump-sum agreements" that did not provide a "basis for comparison with [the defendant's] infringing sales" and no other evidence in the record supported the jury's damages award.  609 F.3d 1308, 1320 (Fed. Cir. 2010).  Here, by contrast, Ms. Bennis appropriately looked at other benchmarks of what the parties would have agreed to during the hypothetical negotiation in order to confirm her determination that the Comparable Netflix Agreements were reflective of the economic position between the parties.  Appx5555-5557.[5]

*Second*, GoTV alleges that Ms. Bennis used the Sound View and R2 licenses "to discount her damages model" because these licenses "included rights to ***far***

---

[5]     *Uniloc USA, Inc. v. Microsoft Corp.*, is inapposite because it concerned the use of the "25 percent rule of thumb" and not the sufficiency of a damages expert's economic comparability analysis of a specific license agreement.  632 F.3d 1292, 1317 (Fed. Cir. 2011).

***more patents*** than would the hypothetical license." GoTV Br. 40 (quoting Appx5554-5555) (emphasis in original). But Ms. Bennis did not "discount" the royalty rates in the Sound View and R2 agreements. Appx5554-5555. Rather, her ultimate royalty computation of between $500K and $1.8 million was directly in line with the unadjusted rates in these licenses. Appx10868 (showing the $1,990,000 and $450,000 lump-sum royalties of the Sound View and R2 licenses, respectively).

Further, GoTV's argument that Ms. Bennis had no basis to suggest that the volume of patents licensed in these two agreements was relevant makes no sense. GoTV Br. 41. It is common sense that a license that grants rights to more patents would generally command a higher royalty than a license that grants rights to far fewer patents. *See Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380–81 (Fed. Cir. 2021) (faulting expert for failing to account for differences between allegedly comparable licenses involving "numerous patents" and "a hypothetical negotiation for a single-patent license").

*Third*, Ms. Bennis did not "fail[] to consider" that the Sound View and R2 agreements were litigation settlements. GoTV Br. 41. During her deposition, Ms. Bennis agreed that both licenses involved "potential or actual litigation." Appx5830-5832(190:11-192:6). Further, when considering these licenses, Ms. Bennis expressly acknowledged that "a license for a patent that is known to be

valid and infringed [as required by the hypothetical negotiation] will carry a higher royalty than one where there is no such certainty."  Appx5554.

*Fourth*, on the Hot Pepper license, GoTV criticizes Ms. Bennis for failing to consider "how much Netflix pays to be a member of AST," GoTV Br. 42, the non-profit licensing consortium that facilitated Netflix's Hot Pepper license and provides other services to its members.  Appx5433.  But GoTV cites no case law requiring Ms. Bennis to analyze the dues Netflix pays to use AST's services, nor any support for the proposition that Netflix's AST dues were somehow reflective of the value of the Hot Pepper license.  In any event, Ms. Bennis's reasonable royalty range was orders of magnitude higher than the $10,000 Hot Pepper royalty and therefore any error in allowing Ms. Bennis's opinion regarding this license was harmless.

For at least these reasons, the district court did not abuse its discretion by allowing Ms. Bennis's opinions regarding the Comparable Netflix Licenses.  In addition, any alleged error in allowing Ms. Bennis's opinions regarding these Licenses would have been harmless because the jury's $2.5 million award is substantially higher than the royalty rates in the 13 Netflix licenses, Appx10868, and the Netflix licenses were cumulative of other trial evidence, including the Phunware licenses discussed by both Mr. Dell and Ms. Bennis, which supported a reasonable royalty of no more than $2.8 million, Appx10850.

**D.    The District Court Did Not Abuse Its Discretion By Allowing Netflix's Expert Opinions Regarding The Phunware Development Agreements**

**1.    Dr. Villasenor Sufficiently Analyzed Technological Comparability**

The district court did not abuse its discretion in denying GoTV's *Daubert* challenge to Dr. Villasenor's opinions regarding the six Phunware agreements. GoTV faults Dr. Villasenor for stating that "to the extent that Dr. Malek asserts that the Learfield application is technologically comparable," then the six other Phunware agreements were as well.  GoTV Br. 47.  But GoTV identifies no precedent precluding Dr. Villasenor from relying on GoTV's own expert, particularly where other evidence regarding the licenses was not made available to Netflix.  Appx5632(¶270).

GoTV's technical expert opined that the Asserted Patents were technologically comparable to the MaaS Content Management functionality of the Phunware software.  Appx5630-5636; Appx5745(¶278).  Dr. Villasenor analyzed the six Phunware agreements and determined that they granted rights to this same MaaS Content Management service or its predecessor.  Appx5630-5636.  GoTV does not dispute that the Phunware licenses granted rights to the MaaS Content Management system or its equivalent.  Nor is this case comparable to *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010), in which the district court ignored the non-comparability of a license solely because the

defendant chose "to offer no expert testimony to counter" the patentee's expert. Here, Dr. Villasenor relied on the comparability representations of the patentee's expert. In addition, Dr. Villasenor separately relied on testimony from Phunware witness Jason Powell, who also stated that he believed that several of the Phunware licenses practiced the Asserted Patents. Appx5632-5635(¶270, ¶272, ¶274).

> ### 2. Ms. Bennis Sufficiently Accounted For The Differences Between The Phunware Agreements And A License For The Asserted Patents

GoTV's challenge to the six Phunware licenses as "software development agreements" rather than "bare patent licenses" (GoTV Br. 48) makes no sense for three reasons. *First*, as explained above, GoTV's royalty calculation was centered on the Learfield Agreement, which was indisputably a ***software development agreement that did not grant rights to patents***. *Supra* p. 15. Ms. Bennis therefore appropriately relied on the six other Phunware agreements to demonstrate that Mr. Dell's cherry-picked royalty from the Learfield agreement was inconsistent even with Phunware's other software agreements. Appx5508-5510.

*Second*, GoTV's criticism that Ms. Bennis "did not consider the differences between the software Phunware developed for its customers and the Netflix software" reflects GoTV's misunderstanding of the hypothetical negotiation. GoTV Br. 48. During the hypothetical negotiation, Netflix would not have paid Phunware to develop "the Netflix software" because, among other reasons, ***the***

***Netflix software had already been developed***.  *Supra* p. 18.  Ms. Bennis's analysis

therefore correctly examined the scope of each Phunware agreement to determine

the value of "the software elements covered by its patents."  Appx5509.  Any

additional complexity in the Netflix software would be wholly irrelevant to the

hypothetical negotiation.

Further, Ms. Bennis ***did*** account for the only material differences between

Netflix's Accused Products and the licensed Phunware applications.  Specifically,

Ms. Bennis "calculated the average professional services fee … in relation to the

number of platforms" used by Netflix, i.e., the TVUI, iOS, Android, and Web

platforms.  Appx5509.

*Third*, GoTV incorrectly suggests that Ms. Bennis's *Georgia-Pacific*

analysis was "the same" as the analysis found insufficient in *Exmark*

*Manufacturing Company v. Briggs & Stratton Power Products Group*, 879 F.3d

1332 (Fed. Cir. 2018).  But in *Exmark*, this Court found that it was "not enough for

an expert to simply assert that a particular royalty rate is reasonable in light of the

evidence without tying the proposed rate to that evidence."  *Id.* at 1351.  Here, Ms.

Bennis relied on specific license agreements to find a royalty range, and provided a

fulsome analysis of the *Georgia-Pacific* factors, including by explaining which

factors impacted the analysis.  Appx5554-5558.

**E.    The District Court Did Not Abuse Its Discretion In Allowing Ms. Bennis's Opinions Regarding The Phunware Pricing Model**

The district court did not abuse its discretion by allowing Ms. Bennis's opinions regarding the 2023 Phunware Pricing Model.  GoTV faults Ms. Bennis for assuming "Phunware would develop the entire Netflix application, which Netflix spends from $28.8 million to $74.4 million annually to update, for no more than $750,000."  GoTV Br. 51.  GoTV again misunderstands the reasonable royalty analysis.  At the time of the hypothetical negotiation, Netflix already had its platform up and running and would not have agreed to pay Phunware to ***develop*** anything.  *Supra* p. 18.  Thus, Ms. Bennis did not look at the 2023 Phunware pricing model to determine how much Phunware would charge Netflix to build a software platform, but rather to provide context for Mr. Dell's inflated royalty figure.  Appx5495-5496.  Specifically, Ms. Bennis explained that Phunware charged "far less than what Mr. Dell is claiming to be a reasonable royalty" for actually building a Mobile App Portfolio, which undermined his assertion that the parties would have agreed to this royalty for a bare patent license.  Appx5496.  Because GoTV's sole challenge to Ms. Bennis's opinion is premised on the flawed position that Netflix would have paid Phunware to develop a software application, the district court's denial of GoTV's *Daubert* motion was not an abuse of discretion.

For at least these reasons, GoTV is not entitled to a new trial on damages.

## II. GoTV Is Not Entitled To Further Proceedings On Infringement

Unhappy with the jury's lump-sum award, GoTV tries to revive its induced infringement claims and resurrect the invalid '865 patent in order to get a second bite at the apple. But GoTV's attempts to bolster its damages award fail because, under GoTV's own damages theory, the jury's lump-sum royalty fully compensates GoTV for any possible infringement of the Asserted Patents by Netflix. Accordingly, there is no need for a remand to address the alleged induced infringement of the Asserted Patents or direct infringement of the '865 patent. In any event, the district court properly dismissed GoTV's induced infringement claims because GoTV did not sufficiently allege Netflix's knowledge of the asserted patents and alleged infringement. Further, the district court correctly concluded that the '865 patent is indefinite because the intrinsic and extrinsic record provide no guidance regarding the scope of "discrete low level rendering command."

### A. The Jury's Lump-Sum Damages Award Fully Compensated GoTV For Any Alleged Infringement

Even if it could prevail on the merits, GoTV would not be entitled to any further proceedings on infringement or damages because the jury's lump-sum award fully compensates GoTV for any possible infringement of the Asserted Patents by Netflix.

A lump-sum royalty is a single payment that fully compensates the patentee "through the life of the patent." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1300-1301 (Fed. Cir. 2015); *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 412 (Fed. Cir. 2018) ("[A] jury may award a lump-sum, paid-in-full royalty in lieu of a running royalty on future sales."). The jury's award of lump sum damages therefore fully compensates GoTV for the infringement found at trial.

Further, GoTV told the jury that the number of patents found to be infringed would not impact the reasonable royalty calculation because "the benefits from Netflix's use of both [the '245 and '715 patents] are the same." Appx621(143:19-22). Consistent with this, when the '865 patent was still in the case, Mr. Dell explained that "to the extent any of the respective Patents at Issue would no longer be asserted against Netflix, for any reason, my royalty rate opinion would likely not change due to the fact that Netflix would continue to realize the same or similar benefits from any of the [three] individual Patents at Issue." Appx7016 n.407.[6]

---

[6]     GoTV's damage base was "the number of subscriber months that Netflix makes use of the patents at issue." Appx588(110:1-3). Under GoTV's damage theory, the base would be the same regardless of the number of patents found to be infringed because GoTV sought damages only as of the filing of the Original Complaint in October 2022. Appx588(110:20-23).

In fact, GoTV did not reduce its damages computation after the '865 patent was found to be invalid. Appx12163-12165(¶¶5-10); *compare* Appx6985 (damages computation for all three Asserted Patents) *with* Appx585(107:7-9) (damages computation for the '715 and '245 patents). Thus, under GoTV's own damages theory, the jury's lump-sum award for infringement of the '715 patent fully compensated GoTV for any use by Netflix of one or all of the Asserted Patents.

**B.** **GoTV Is Not Entitled To A Remand On Induced Infringement**

**1.** **There Is Nothing To Litigate On Inducement**

There is nothing left to litigate between the parties on induced infringement. Therefore, this Court need not decide whether GoTV's Original Complaint could have given Netflix knowledge of the Asserted Patents and alleged infringement sufficient to support induced infringement claims in this action.

*First*, even if induced infringement were found, GoTV would not be entitled to any additional damages. As explained above, the jury's award of a lump-sum royalty fully compensates GoTV for any use of the Asserted Patents. *Supra* pp. 43-44. Further, because GoTV has been fully compensated for direct infringement, GoTV cannot attempt to seek additional damages under an inducement theory because "where a patentee has enforced its patent against a direct infringer and collected damages sufficient to put him in the same position he

would have been in had there not been infringement, the patentee cannot thereafter collect actual damages from an alleged indirect infringer." *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851, 872 (Fed. Cir. 2006); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 512-513 (1964) ("[A]fter a patentee has collected from or on behalf of a direct infringer damages sufficient to put him in the position he would have occupied had there been no infringement, he cannot thereafter collect actual damages from a person liable only for contributing to the same infringement" and there can "be no question" that payment "made under judicial decree … represented full compensation for the infringing use").

Further, to the extent GoTV suggests that its hypothetical negotiation analysis would have been different for its induced infringement claims, this Court has made clear that "a direct infringer or someone who induced infringement should pay the same reasonable royalty ***based on a single hypothetical negotiation analysis***." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012).

There is also no support for GoTV's suggestion that it was prejudiced because it was "unable to include the benefits Netflix received from its customers' use of the '245 Patent." GoTV Br. 25-26. GoTV's expert report on damages stated that the reasonable royalty should be a running royalty of $34,894,400. Appx6985. When the report was filed, GoTV's infringement theory for the '245

patent was that Netflix directly infringed every time its customers used the Netflix application.  Appx2476-2477(¶¶293-297); Appx2486-2487(¶442).

The district court later granted summary judgment in favor of Netflix on this theory.  Appx62-63.  Nevertheless, at trial, GoTV requested a reasonable royalty of $35,184,480, Appx585(107:7-9), even higher than the $34,894,400 reasonable royalty identified in its expert report.[7]  Thus, GoTV's damages theory was not affected by its inability to point to the actions of Netflix's customers.

In addition, GoTV *did* present evidence of the benefits Netflix receives from customer use of its application.  Specifically, GoTV's royalty base was based on the "number of *subscriber months* that Netflix makes use of the patents at issue in this case."  Appx588(110:1-3).  Further, GoTV's attorney elicited testimony from Netflix witnesses regarding the purported importance of the claimed technology to Netflix customers.  Appx676(198:5-14) (Netflix representative Mr. Johnson being asked whether "if a customer tried to use Netflix on a device and it didn't work, that would be a problem").  There is therefore no support for GoTV's claim of prejudice.

*Second*, there is nothing left to adjudicate on the merits of GoTV's claims that Netflix induced AWS, Verizon, and Comcast to infringe the '865 and '715

---

[7]     This increase reflected updated subscriber information through Q2 2023. Appx12165-12166(¶13).

patents.  Before summary judgment motions were filed, the parties executed a joint

stipulation that, for purposes of this litigation only, ██entity██ and Netflix's ██entity██ which

include Verizon and Comcast, do not ███████ function ███████

████████.  *Supra* p. 12; Appx1057.  As a result of this stipulation, GoTV had

the opportunity to convert the alleged infringement by these third parties into direct

infringement by Netflix.  But at trial, GoTV was fully heard on direct

infringement, leaving nothing left to adjudicate on an inducement theory relating to

these parties.

Further, GoTV does not identify any purported prejudice resulting from the

district court's dismissal of induced infringement claims with respect to the '865

and '715 patents.  GoTV Br. 25-26.  For this reason alone, no remand is necessary

on those two patents.[8]

### 2. GoTV's Original Complaint Could Not Create An Induced Infringement Claim

Even if the Court reaches the issue, it should affirm the district court's

decision that GoTV did not adequately plead inducement.  To state a claim for

induced infringement, the plaintiff must plead facts showing that "the accused

inducer took an affirmative act to encourage infringement with the knowledge that

---

[8]     This Court also does not need to reach this issue with respect to the '865 patent because the district court properly found the claims of the '865 patent indefinite.  *Infra* pp. 54-57.

the induced acts constitute patent infringement." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014). Here, GoTV's only evidence of Netflix's purported knowledge of both the Asserted Patents and alleged infringement was the Original Complaint served only 16 days before the filing of the First Amended Complaint. Appx4; Appx12157. While GoTV's FAC also alleged that Netflix "remain[ed] willfully blind to the infringement," GoTV did not allege any facts supporting this allegation. *Supra* p. 11.

The district court correctly determined that GoTV could not use its Original Complaint to manufacture an induced infringement claim that was unavailable at the time of filing. Appx4. Allowing plaintiffs to plead induced infringement based solely on an amended complaint served days after the original complaint would subject nearly all accused infringers to allegations of induced infringement.

Further, because GoTV did not provide pre-suit notification of the Asserted Patents or alleged infringement, Netflix "had no opportunity to evaluate [GoTV's] claims pre-suit" and "would be forced to 'cease all allegedly infringing conduct once a complaint is filed' to avoid such claims in the future." Appx4. Other district courts have similarly found that it would be "neither wise nor consistent with principles of judicial economy to allow court dockets to serve as notice boards for future legal claims for indirect infringement." *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 251 (D. Del. 2021); s*ee also E-Vision Optics,*

*LLC v. Luxottica Grp. S.p.A.*, 2024 WL 3468839, at *4 (C.D. Cal. June 11, 2024) ("[A] plaintiff cannot prove an element of a legal claim solely with evidence that the plaintiff filed the claim."); *VLSI Tech. LLC v. Intel Corp.*, 2023 WL 8654391, at *31 (N.D. Cal. Dec. 14, 2023) ("[B]ecause a complaint and infringement contentions are a necessary part of patent litigation, a finding that they alone satisfy post-suit notice would invite claims of willful infringement and indirect infringement into literally every patent suit."). GoTV's arguments to the contrary are unavailing.

*First*, GoTV's case law does not support reversal. GoTV incorrectly suggests that this Court "has previously found that pre-suit knowledge is not required." GoTV Br. 17-18, 21. But *In re Bill of Lading Transmission & Processing System Patent Litigation*, 681 F.3d 1323 (Fed. Cir. 2012), did not address whether an original complaint is sufficient to give rise to induced infringement claims in the same proceeding. Nor could it have done so, as the relevant questions on appeal were (1) whether the defendants' product documents instructed customers to perform each step of the patented method and (2) whether it was "reasonable to infer intent to induce from the general statements [defendants] made about the benefits of using its products" *Bill of Lading*, 681 F.3d at 1341-1346.

GoTV's reliance on *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959 (Fed. Cir. 2018) is similarly flawed. GoTV Br. 21. The only indirect infringement question in *WCM* was whether there was underlying direct infringement, and the Court had no need to address the standard for establishing knowledge for purposes of induced infringement. 721 F. App'x at 969. In any event, in *WCM*, the plaintiff "provided sufficient evidence for a reasonable jury to conclude that IPS *did* know of [plaintiff's] patents as they issued, if not earlier." *Id.* at 970 (emphasis in original). Further, substantial evidence supported the jury's conclusion that "the risk of infringement was known" to defendant. *Id.* at 971. Thus, *WCM* does not come close to suggesting that the mere filing of a complaint can give rise to induced infringement claims in the same action.

*Second*, GoTV's policy considerations do not support reversal. GoTV Br. 22-24. GoTV relies on a purported lack of "practical difference" between a pre-complaint notice letter and a complaint. GoTV Br. 22. But allowing plaintiffs to plead knowledge based solely on the filing of a complaint would disincentivize pre-suit negotiations and waste judicial resources. Pre-suit notice letters force parties to communicate prior to filing suit and facilitate possible licensing solutions before the court has to expend any judicial resources. Additionally, a party that receives a pre-suit notice letter can come forward with its evidence of non-

infringement or invalidity and potentially dissuade suit before a court has to expend any resources.

An exchange of letters outside of litigation also creates a clearer record of the parties' positions for the jury to follow. By contrast, when notice is provided solely by a Complaint, the first opportunity to respond is the Answer. But Answers generally have more complicated syntax than pre-suit correspondence and typically raise arguments and counterclaims that may make it harder for the jury to decipher whether the defendant believes that there is infringement. Further, the filing of an Answer may be delayed if there is a motion to dismiss.

Pre-litigation communications also allow for separation between opinions of counsel who advise on the allegations in the notice letter and the opinions of subsequent litigation counsel. When notice of the patents and alleged infringement comes in the form of a complaint, the first opportunity respond is the Answer making litigation counsel a central factual player in the events the jury needs to examine.

GoTV incorrectly alleges that the district court ruling will prevent inducement claims from being filed on the day a patent issues and devalue method claims. GoTV Br. 22-24. A patentee who does not want a delay between the issuance of its patent and the commencement of an induced infringement action can utilize the temporal gap between the notice of allowance and the issuance of

the patent to provide the requisite pre-suit notice to an alleged induced infringer.

*See, e.g.*, 35 U.S.C. § 151; 35 U.S.C. § 154(b)(1)(A)(iv). Likewise, patentees with

method claims can employ the well-established approach of sending a notice letter.

GoTV also contends that "[a]ny potentially unfair damages would be limited

to the narrow period between the filing of the complaint and the time by which the

defendant had a meaningful chance to evaluate and stop the infringing activity."

GoTV Br. 24-25. But GoTV's FAC did not expressly limit its claims for induced

infringement to such a time period, or even to post-suit activities. *See* Appx999-

1000(¶39); Appx1013(¶64); Appx1026(¶87); Appx1027. Nor did the mere 16

days between service of the Original Complaint and filing of the FAC provide a

"meaningful chance" to evaluate whether there was infringement. *Compare*

Appx12157 (Original Complaint served 10/25/2022) *with* Appx980 (FAC filed

11/10/2022). Further, GoTV ignores that even under the district court's ruling, it

had an opportunity to provide notice of the patents and alleged infringement

outside the context of litigation and file new inducement claims, but it failed to

avail itself of that opportunity.

### 3. GoTV's Inducement Allegations Were Insufficient

GoTV's induced infringement allegations fail even apart from the problem

identified by the district court. GoTV alleged only that "Netflix had actual

knowledge of the [Asserted Patents] at least as of the date of Plaintiff's Original

Complaint" and thus "was on notice, knew and/or should have known that its actions induced direct infringement by third parties." Appx999-1000(¶39); Appx1013(¶64); Appx1026(¶87). But "indirect infringement requires knowledge of the underlying direct infringement—not merely the knowledge of the existence of the patent." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1364 (Fed. Cir. 2016); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). And GoTV's allegations "[s]imply repeat[] the legal conclusion" that Netflix "induced infringement." *Addiction & Detoxification Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 938 (Fed. Cir. 2015).

GoTV also pleaded no facts supporting its passing reference to Netflix's purported willful blindness. Appx1000(¶40); Appx1013(¶65); Appx1026(¶88). For example, GoTV did not plead facts plausibly suggesting that Netflix "subjectively believe[d] there [wa]s a high probability" of infringement or indicating what "deliberate actions" Netflix took "to avoid learning of that fact." *Largan Precision Co. v. Genius Elec. Optical Co.*, 646 Fed. App'x 946, 948 (Fed. Cir. 2016).

GoTV's complaint is therefore distinguishable from the complaints at issue in *Bill of Lading*, which all provided specific factual allegations about the defendants' conduct once they learned of the patents. *See, e.g.*, 09-MD-2050, Dkt.

126, at ¶¶116-125.[9]  Nor could GoTV plausibly make such an allegation of specific intent if granted leave to amend here because the record shows that, at the first opportunity after Netflix retained counsel and evaluated the allegations, Netflix denied infringement in its Answer.

## C. The District Court Properly Determined That The Claims Of The '865 Patent Are Indefinite

The district court correctly rejected GoTV's construction of "discrete low level rendering command" and concluded that the claims of the '865 patent are indefinite because a skilled artisan would not reasonably understand the scope of this term.  In addition to the lack of error, GoTV was not harmed because it has been fully compensated for any possible use of the Asserted Patents by Netflix.

### 1. The District Court Correctly Determined That The Claims Of The '865 Patent Are Indefinite

Claim 1 of the '865 patent recites a "***discrete low level rendering command*** that is within said rendering capability of said wireless device but that is of a syntax that is wireless device generic."  Appx188(20:41-63).  The district court correctly concluded that the claims of the '865 patent are indefinite because the record lacked any "guidance from the patent, its prosecution history, or the relevant art" as to the meaning of "discrete low level rendering command."

---

[9]     In addition, several defendants in *In re Bill of Lading* received notice of the patents through a cease and desist letter.  09-MD-2050, Dkt. 125 at 21 (S.D. Ohio); *Id.* at Dkt. 127; *Id*. at Dkt. 121.

Appx56; *see Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("the claims, when read in light of the specification and the prosecution history," do not "provide objective boundaries for those of skill in the art").

There is no dispute that "low level rendering command" is not a term of art. Appx1731; Appx3538-3541. Nor does GoTV contend that the claims or prosecution history of the '865 patent shed light on the meaning of "discrete low level rendering command." Instead, GoTV points to several disclosures in the specification as purported "explicit[]" definitions of "discrete low level rendering command." GoTV Br. 27. But *all* of GoTV's cited support relates to "basic commands," Appx180(3:59-63), Appx185(13:18-25), Appx3930-3935, which GoTV's expert conceded are "not the same as rendering commands." Appx1922-1923(105:11-106:7) ("Q. Are basic commands the same thing as rendering commands? … THE WITNESS: The basic commands are a description of – for rendering a page. So *it's not the same as a rendering command*. It's a description that's used by the client for rendering a page."). GoTV's cited examples therefore cannot provide any guidance on the meaning of "discrete low level rendering command."

Further, the specification does not provide any examples of "discrete low level rendering commands" that would clarify the scope of this term. While GoTV points to Figures 4 and 5 as purportedly illustrative of the scope of "discrete low

level rendering command," GoTV Br. 28, neither figure depicts "discrete low level rendering commands."

Critically, the description of Figure 5 cited by GoTV, GoTV Br. 28, does not refer to "discrete low level rendering commands," Appx187(17:57-18:15). Rather, it states that "basic commands may be *low level compilation operable to render application content* on the client." *Id.* GoTV does not identify any evidence that a skilled artisan would reasonably understand that "low level compilation operable to render application content" is somehow synonymous with "low level rendering command." But even if these terms were synonymous, this passage does not suggest that "low level" should be construed as "tailored based on wireless device capability" as GoTV suggests. Rather, the next line of this disclosure is "[f]or example, basic commands may layout page content for the requested application," which says nothing about wireless device capability. *Id.* In any event, this disclosure, like the other disclosures cited by GoTV, relates to "basic commands," which are "not the same as rendering commands." Appx1922-1923(105:11-106:7).

GoTV also argues that "Commands 410, 430, 440, and 490" in Figure 4 are "discrete low level rendering commands." GoTV Br. 28. But the specification identifies commands 410, 430, 440, and 490 as "basic commands." Appx186(15:56-67). And again, GoTV's expert conceded that "basic commands"

are not the same thing as "discrete low level rendering commands."  Appx1922-1923(105:11-106:7).  Thus, neither of GoTV's cited examples sheds any light on the meaning of "discrete low level rendering command."[10]

The specification's discussion of "high level" also does not shed any light on the difference between a "low level rendering command" and a high level rendering command.  Specifically, the specification refers only to a "high level template" or a "high level language," both of which are an "extensible markup language (XML)."  Appx180(3:33-43); Appx187(17:6-9, 20-27, 43-60).  This discussion provides no guidance on what a low level template or language would be, let alone a "discrete low level rendering command."

Thus, for at least these reasons, the intrinsic record provides no guidance regarding the difference between a "low level rendering command" and a "high level rendering command" and the district court's indefiniteness determination should be affirmed.

### 2. The District Court Correctly Rejected GoTV's Construction Of "Discrete Low Level Rendering Command"

The district court also properly rejected GoTV's attempt to save its claims by construing "discrete low level rendering command" as "[a] discrete rendering

---

[10]    GoTV's reliance on claim 2 (GoTV Br. 28) makes no sense because it refers to the "wireless device generic template" not the "discrete low level rendering command," Appx188(claim 2).

command that is tailored based on wireless device capability." Appx55. As the district court determined, GoTV's construction impermissibly rendered "significant portions of the specification and claims to be superfluous." *Id.* For example, substituting GoTV's construction into the specification would render "tailored based on the rendering capability of the client" superfluous:

> As such, precompiled basic commands are discrete rendering commands that are [*tailored based on wireless device capability*] tailored based on the rendering capability of the client 210.

Appx56 (blue text GoTV's construction).

Substituting GoTV's construction into claim 1 of the '865 patent would also improperly render "that is within said rendering capability of said wireless device" superfluous:

> at least one [*discrete rendering command that is tailored based on wireless device capability*] that is within said rendering capability of said wireless device.

Appx188(20:53-58) (blue text GoTV's construction). Similarly, substituting GoTV's construction into the Abstract of the '865 patent would cause "within the rendering capability of the wireless device" to become superfluous:

> The first screen is translated into a second screen description that includes [*discrete rendering command[s] that [are] tailored based on wireless device capability*] within the rendering capability of the wireless device that is syntax generic.

Appx168(Abstract) (blue text GoTV's construction).

As the district court correctly found, a construction that would render other language "superfluous" is disfavored. *See, e.g.*, *Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000). GoTV incorrectly argues that its construction does not cause any claim language to be superfluous because "a command can be within the rendering capability of a wireless device without being tailored to that device." GoTV Br. 31. But something that is "tailored based on wireless device capability" must be "within said rendering capability of said wireless device" because commands the device could not handle would not be tailored for the device. Thus, GoTV's argument fails to eliminate the problem of rendering claim language superfluous.

GoTV also argues that "low level" is not limited to "rendering capability" and could instead be "tailored based on a wireless device's 'global positioning system (GPS) capabilities.'" GoTV Br. 31 (citing Appx184(11:28)). But GoTV's cited support does not discuss tailoring rendering commands based on GPS capabilities, it merely states that "the wireless device type and capabilities may include … … global positioning system (GPS) capabilities." Appx184(11:22-28). In any event, GoTV cites no evidence that a skilled artisan would reasonably understand "tailored based on wireless device capability" to mean "tailored based only on wireless device GPS capability" as it now suggests. GoTV Br. 31.

GoTV's other arguments in favor of its construction are unavailing. GoTV points to several disclosures in the specification as purported "explicit[]" definitions of "discrete low level rendering command." GoTV Br. 27 (citing Appx185(13:18-25), Appx180(3:59-63)). As explained above, however, these disclosures *all* relate to "basic commands," which are concededly different than "discrete low level rendering commands." *Supra* p. 55.

GoTV additionally accuses the district court of relying on cases that "do not hold that any redundancy renders a claim indefinite." GoTV Br. 29. But the district court did not find the claims indefinite based on the redundancy of GoTV's construction. Rather, the district court rejected GoTV's construction because it caused claim language to be superfluous, and found the claims indefinite because the intrinsic evidence did not provide a skilled artisan with reasonable certainty about the scope of the invention. Appx55-56.

The district court's cited case law confirms that GoTV's construction was improper because it is "highly disfavored to construe terms in a way that renders them void, meaningless, or *superfluous*." *See Wasica Fin. GmbH v. Continental Auto. Sys. Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017); *see also Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir 2010) (the notice function of patents "would be undermined" if "courts construed claims so as to

render physical structures and characteristics specifically described in those claims superfluous.").

GoTV additionally points to case law regarding "whereby" clauses as evidence that redundancy does not "necessarily render[] a claim invalid." GoTV Br. 29-30. But the limitation at issue here is not a "whereby" clause. Whereby clauses are frequently not limiting because they merely "express the necessary results of what is recited in the claims." *Texas Instruments Inc. v. ITC*, 988 F.2d 1165, 1171-1172 (Fed. Cir. 1993). Here, by contrast, GoTV does not argue that the relevant limitation of the '865 patent is not limiting. In any event, the district court did not find indefiniteness based on redundancy. *Supra* p. 54.

Finally, GoTV argues that a rule against redundancy is inconsistent with the doctrine of claim differentiation. GoTV Br. 30 (citing *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368 (Fed. Cir. 2009)). *ICU* did not address a construction that rendered language ***within the same claim*** superfluous. Rather, the question was whether the district court erred in construing claim 9 as requiring a pointed spike where a separate dependent claim recited "wherein said end of said spike is pointed so that it can pierce said seal and enter into a portion of said medical implement when said implement is connected to said valve." *ICU*, 558 F.3d at 1375-1376 (emphasis removed). This Court held that there was no error under the specific facts of the case and did not suggest that it is proper to construe

a claim such that language within that same claim is rendered superfluous. *Id.* As this Court has repeatedly held, it is not. *See, e.g.*, *Voice Tech Corp. v. Unified Patents, LLC*, __ F.4th__, 2024 WL 3611584, at *7 (Fed. Cir. Aug. 1, 2024) (rejecting construction that would "incorporate the steps recited in claim limitation [1.3] (deciding and selecting) directly into claim limitation [1.1] (receiving), thereby leaving claim limitation [1.3] no work to do").

For at least these reasons, the district court's indefiniteness finding should be affirmed.

### 3. Even If This Court Disagrees, GoTV Would Not Be Entitled To A Remand

The district court correctly determined that the claims of the '865 patent are indefinite, but even if this Court disagreed, a remand would not be necessary. As explained above, GoTV did not change its damages calculation after the '865 patent was found to be invalid and consistently took the position that the number of patents found to be infringed did not impact the reasonable royalty. *Supra* pp. 43-44; *see also* Appx621(143:19-22); Appx7016 n.407. Further, GoTV was awarded a lump sum royalty that fully compensated it for the infringement finding at trial. *Supra* pp. 42-44. Accordingly, GoTV has been fully compensated for any possible use by Netflix of the Asserted Patents, including the '865 patent.

## III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY LIMITING GOTV'S PRE-JUDGMENT INTEREST TO THE ACTUAL DAMAGES PERIOD

The district court did not abuse its discretion when it rejected GoTV's

request to nearly double GoTV's recovery by awarding interest for a period of time

in which no damages were owed.  Appx10906 (seeking $2,013,988 in pre-

judgment interest on a $2.5 million award).  "Abuse of discretion is a highly

deferential standard of appellate review."  *Bayer CropScience AG v. Dow*

*AgroSciences LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017).  The district court did

not abuse its discretion by limiting GoTV's pre-judgment interest to the time

period for which damages were recoverable, i.e., beginning with the filing of the

complaint.  Appx94.

*First*, GoTV does not identify any precedent holding that a patentee who

waives pre-filing damages must nevertheless be awarded interest from the date of

the hypothetical negotiation.  Instead, GoTV relies on case law regarding the

"[t]ypical[]" procedure for awarding pre-judgment interest.  GoTV Br. 63.  But, as

the district court found, this case is "not a typical case" because GoTV waived any

right to seek pre-suit damages.  Appx94.

*Second*, the district court properly tied its decision to the nature of GoTV's

damages award.  "District courts have discretion to limit prejudgment interest" so

long as there is "justification bearing a relationship to the award."  *Nickson Indus.,*

*Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 800 (Fed. Cir. 1988).[11] Here, the district court expressly acknowledged that pre-judgment interest "typically" begins on the date of the hypothetical negotiation, but invoked its discretion to limit pre-judgment interest because GoTV "stipulated that it would not seek pre-suit damages." Appx94. The district court reasoned that limiting pre-judgment interest to that same period was appropriate because it would "make little sense to allow interest to start accruing before damages can be imposed." *Id.* (citation omitted).

This Court has previously found that a district court did not abuse its discretion by awarding pre-judgment interest from the date of a complaint rather than the date of infringement. *See Tekmax, Inc. v. Exide Corp.*, 215 F.3d 1339, n.3 (Fed. Cir. 1999) (Table) ("Tekmax asserts that it should be awarded prejudgment interest at a rate of 9 percent compounded monthly from the date of infringement not the date of its complaint. … We find no abuse of discretion."); *see also Acceleron, LLC v. Dell Inc.*, 2022 WL 1087683, *20 (N.D. Ga. Mar. 7, 2022) (limiting pre-judgment interests where the patentee "made the strategic decision to waive pre-suit damages"), *aff'd Acceleron, LLC v. Dell, Inc.*, 2023 WL 4503189 (Fed. Cir. July 13, 2023) (summary affirmance); Corrected Non-Confidential Brief

---

[11]     While the *Nickson* Court remanded the district court's pre-judgment interest determination, that was because there was "no basis on which the correctness or incorrectness of the district court's partial denial of prejudgment interest can be determined." 847 F.2d at 800-801.

for Plaintiff-Appellant, *Acceleron, LLC v. Dell Inc.*, 2022 WL 3567222, at \*59-\*60 (Fed. Cir. July 29, 2022) (arguing that plaintiff was entitled to pre-suit damages from the hypothetical negotiation and not the filing of the complaint).

*Third,* courts routinely deny pre-judgment interest from the date of the hypothetical negotiation where the hypothetical negotiation predates the six-year period on recovery of past damages. *See, e.g.*, *Opticurrent, LLC v. Power Integrations, Inc.*, 2019 WL 2389150, at \*20 (N.D. Cal. June 5, 2019) (patentee not entitled to interest from date of infringement more than six years before the filing of the complaint), *aff'd*, 815 F. App'x 547 (Fed. Cir. 2020); *Trustees of Boston Univ. v. Everlight Elecs. Co.*, 187 F. Supp. 3d 306, 321-322 (D. Mass. 2016) ("[Patentee] does not cite a single case in which interest began accruing from the date of a fictional negotiation hypothesized to have taken place more than six years before suit was filed."); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 2017 WL 1716589, at \*4 (E.D. Tex. Apr. 27, 2017) (interest limited to "six years before Plaintiff filed its complaint").

The same logic applies here. With no right to pre-suit damages, GoTV was not deprived of anything to which it had a legal entitlement until the date of suit, and it would be anomalous for interest to begin running on a damages award before GoTV would have been entitled to claim damages. Indeed, GoTV's request for prejudgment interest reaches back so far it would directly violate the six-year

damages period.  *See* 35 U.S.C. § 286 ("***no recovery*** shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action").

*Fourth*, GoTV's cited case law does not limit the district court's discretion. GoTV's cases did not address whether a district court can choose to limit pre-judgment interest where a patentee waives pre-filing damages.  *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1983); *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1076 (Fed. Cir. 2020); *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).  And *LaserDynamics, Inc.* (GoTV Br. 64), supports the district court's decision to sever the concept of the hypothetical negotiation date from the calculation of damages and interest by making clear that this Court has:

> been careful to distinguish the hypothetical negotiation date from other dates that trigger infringement liability.  For example, the six-year limitation on recovery of past damages under 35 U.S.C. § 286 does not preclude the hypothetical negotiation date from taking place on the date infringement began, even if damages cannot be collected until some time later.

694 F.3d at 75.

*Fifth*, GoTV's argument that Ms. Bennis discounted her damages opinion "back to 2015," GoTV Br. 65, ignores that the jury's $2.5 million award was substantially higher than Ms. Bennis's $1.7 million upper bound, Appx775(10:3-7).  In addition, Ms. Bennis told the jury that her calculations were based on taking

the terms of the comparable agreements and bringing "those back to **present day dollars**" to get "the range of total payments over all of these agreements." Appx791(26:13-21). There is therefore no basis to infer that the jury's award reflects any sort of discounting back to the hypothetical negotiation date.

Even if the award were discounted to the hypothetical negotiation date, however, it would make no difference. Prejudgment interest is designed to compensate a patent owner for the gap between when it became entitled to damages and the judgment. *Sesonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) ("[A]n award of prejudgment interest serves to make the patent owner whole" for "the foregone use of money of which the patentee was wrongly deprived."). GoTV was not entitled to damages as of the hypothetical negotiation date because it waived any claim to pre-suit damages. It thus effectively left the lump sum that would have been agreed to on the hypothetical negotiation date unclaimed through its own actions. It was only when the damages period started that GoTV's deprivation of that lump sum began. Thus, while it was Netflix's responsibility to pay GoTV prejudgment interest from the period GoTV was first deprived of payment through entry of judgment, Netflix was not responsible for compensating GoTV for the period in which GoTV was not entitled to any damages through its own actions. A contrary rule would allow patent owners to

use prejudgment interest to make an end run around statutory limits on damages, as GoTV is attempting here.

For at least these reasons, the district court did not abuse its discretion by limiting GoTV's pre-judgment interest to the time period for which damages were recoverable, i.e., the time period beginning with the filing of the complaint.

## CROSS-APPEAL

## I. THE ASSERTED PATENTS ARE DIRECTED TO INELIGIBLE SUBJECT MATTER

The district court legally erred in concluding that the claims of the Asserted Patents were patent eligible under 35 U.S.C. § 101. The claims are directed to the abstract idea of presenting data from a server on a wireless device based on information about that device, and they recite using conventional computer technology to organize data between a generic server and an off-the-shelf wireless device. The claims of the Asserted Pates are therefore invalid under § 101 and, at minimum, the analysis should not have stopped at *Alice* Step 1.

### A. *Alice* Step 1: The Asserted Patents Are Directed To An Abstract Idea

Step 1 of the *Alice* test determines whether a claim is "directed to a patent-ineligible concept," such as an abstract idea. *Alice Corp. Party Ltd. v. CLS Banks Int'l*, 573 U.S. 208, 218 (2014). Here, the claims of the Asserted Patents are directed to the abstract idea of presenting data from a server on a wireless device

based on information about that device.  To accomplish this, the claims do not

recite any new hardware or specialized algorithms or structures.  Instead, they

move common computing tasks from a conventional wireless device to a central

server and send specific data to the wireless device based on information about that

device.

The claims are therefore analogous to claims previously found to be directed

to the abstract idea of organizing data.  *See, e.g.*, *AI Visualize, Inc. v. Nuance

Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024) ("converting data and using

computers to collect, manipulate, and display the data."); *Eolas Tech. Inc. v.

Amazon.com, Inc.*, 2024 WL 371959, at \*5-\*6 (Fed. Cir. Feb. 1, 2024)

("interacting with data objects on the World Wide Web" using distributed

computing approach); *Bluebonnet Internet Media Servs., LLC v. Pandora Media,

LLC*, 2024 WL 1338940, at \*2 (Fed. Cir. Mar. 29, 2024) ("customizing a product

according to a customer's likes and dislikes," a "type[] of method[] of organizing

digital media").  Accordingly, the district court legally erred in stopping its

analysis at *Alice* Step 1.

*First*, the claims of the Asserted Patents recite the general concept of

organizing data using a distributed computer system that moves common

computing tasks from a client device to a central server.  GoTV Br. 6 ("distributed

network architecture"); Appx1251 (distributing "activity between the server and

wireless device"). Claims 1 of the '865 and '715 patents are directed to the server-side of the claimed distributed network architecture. *See* Appx188(20:42-63); Appx166(20:40-62).[12] Claim 1 of the '245 patent focuses on the client-side of the distributed network architecture, i.e., the wireless device. *See* Appx142(20:41-64).

This Court has previously found similar claims to be patent ineligible because they "merely describe[d] a desired function or outcome without providing details of the claimed distributed processing." *Eolas*, 2024 WL 371959, at *6. In *Eolas*, the claims were directed to "interacting with data objects" on the internet using a distributed computing approach. *Id.* at *5. The patentee argued that its claims "address[ed] scalability with its distributed computing configuration: 'new applications are broken up and distributed, with one part working in the browser and other parts on remote distributed application computers.'" *Id.* This Court determined that "[w]hether analyzed as technological improvements under *Alice* step 1 or as [an] inventive concept[] under *Alice* step 2," distributed computing did not "make the claim eligible." *Id.* at *6. In so concluding, this Court noted that "it [wa]s undisputed that, at the time of the invention, distributed processing was well-understood, routine, conventional activity." *Id.*

---

[12] It is undisputed that claim 1 of each Asserted Patent is representative, Appx45, and that these claims are not distinct for purposes of patent eligibility, Appx46-47, Appx1395-1396.

Here, as in *Eolas*, the claims of the Asserted Patents describe a desired function without providing details of how that function is performed other than by the broad concept of distributed computing. Appx1398. Specifically, the claims of the Asserted Patents use broad, functional language like "receiving," "executing," "generating," and "rendering" without explaining or claiming ***how*** those functions are performed. Appx188(20:42-63); Appx142(20:41-64); Appx166(20:40-62). Accordingly, none of the claims of the Asserted Patents "sufficiently describe how to achieve these results in a non-abstract way." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (abstract idea of "gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions").

GoTV's brief confirms the abstract nature of the claims. While GoTV contends that claim 1 of the '865 patent "recites a specific step by step" method, it focuses entirely on the functions the method must perform, not any specific technological improvements responsible for those outcomes. GoTV Br. 6-7.

GoTV also points to four purported "specific data structures" in the claims. GoTV Br. 7. But none of these "data structures" makes the claims any less

abstract because the shared specification describes them using only broad, functional language:

- **Custom Configuration:** The shared specification discloses that "the custom configuration ***provides the 'look and feel'*** of the content of the requested application." Appx180(3:14-17); *see also* Appx179(2:54-60); Appx186(16:51-61); Appx187(18:41-43). This description is nothing more than the abstract idea of the "look and feel" of an application.

- **Rendering Blocks:** "Rendering blocks" are disclosed as performing "rendering operations" and "operat[ing] in a way that is device specific." Appx182(7:21-34); *see also* Appx182(7:23-29). But the specification does not provide any specific means for how these functions can be actually achieved. Further, the specification's examples of rendering blocks demonstrate they are simply generic and conventional objects, such as "static text," "an image," and a "pop-up menu." Appx182(8:60-61, 66); Appx183(9:5-14).

- **Render Commands With Device Generic Syntax:** The specification's isolated references to "render commands with device generic syntax" provide no details regarding how they are implemented, how they are made to have "device generic syntax," or even how they function. *See* Appx168(Abstract); Appx188(20:53-58).

- **Compiled Content:** The specification discloses that "compiled content" is pre-compiled to be sent as a single unit, but does not disclose how to achieve that end-result or place any meaningful limitations on the content being compiled. *See, e.g.*, Appx185(13:15-18); Appx182(7:42-45); Appx188(19:5-20).

Thus, GoTV's identified "data structures" do not constitute "'specific means or method[s] that improve the relevant technology'" sufficient to render the claims of the Asserted Patents non-abstract. *AI Visualize, Inc.*, 97 F.4th at 1378 (citation omitted). The district court therefore erred in finding that the claims of the Asserted Patents are directed to an improvement in computer capabilities based on the "use of these application programs, device generic templates, and custom configurations." Appx46. *See, e.g.*, *Caselas, LLC v. Verifone, Inc.*, 2024 WL 2720092, at *2 (Fed. Cir. May 28, 2024) (claim "recite[d] standard information processing steps at a high level of generality, not specific improvements to basic computer functionality").

*Second,* the purported benefit of the system, i.e., that it "relieve[s] developers of needing to develop separate applications for each type of supported wireless device," Appx46(citing Appx188(20:14-18)), is itself the abstract idea of customizing a product to the end-user. This Court has previously held that claims directed to such customization were ineligible data organization claims. *See*

*Bluebonnet, LLC,* 2024 WL 1338940, at *2 ("customizing a product according to a customer's likes and dislikes"); *Impact Engine, Inc. v. Google LLC*, 2024 WL 3287126, at *6 (Fed. Cir. July 3, 2024) ("generating customized or tailored computer communications based on user information"); *Affinity Labs of Texas, LLC v. Amazon.com Inc*., 838 F.3d 1266, 1271-1272 (Fed. Cir. 2016) ("customized user interface"); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369-1370 (Fed. Cir. 2015) ("customizing web page content as function of navigation history and information known about [a] user).

*Third*, the claimed technology is merely the streaming equivalent of Netflix's original method of sending content: mailing DVDs from a central library to end users based on their media player's characteristics. Appx1397. But automating an old practice is itself an abstract idea. *Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th 1345, 1352-1353 (Fed. Cir. 2024) ("automat[ing] the majority of the tasks of a common pre-employment background investigation"). So too is "[i]mplement[ing] an old practice in a new environment." *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094-1095 (Fed. Cir. 2016).

For at least these reasons, the district court erred in finding the claims patent eligible at *Alice* Step 1.

## B. *Alice* Step 2: The Claims Recite Routine, Conventional Activity Implemented Using Off-The-Shelf Components

This Court should reverse the district court's patent eligibility determination because, as a matter of law, the claims lack an inventive concept sufficient to transform the claimed abstract idea into a patentable invention.

Before the district court, GoTV characterized the purported inventive concept as the "distributed architecture provided by the Asserted Patents." Appx1267; Appx1402. But as explained above, this Court previously found that such distributed computing systems were "well-understood, routine, conventional activity" long before the 2007 priority dates of the Asserted Patents. *Eolas*, 2024 WL 371959, at *6; *id.* at *1 ("The '507 patent claims priority from a patent filed in 1994.").

Further, as explained above, the claims of the Asserted Patents merely recite broad computer functionality aimed at increasing the speed or efficiency of developing and updating applications for wireless devices. This is insufficient to confer patent eligibility. *See Intellectual Ventures I LLC*, 792 F.3d at 1370 ("[M]erely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea.").

Finally, the claims recite "no more than the sort of 'perfectly conventional' generic computer components employed in a customary manner" that this Court has found insufficient to confer patent eligibility. *Audatex N. America, Inc. v.*

*Mitchell Int'l Inc.*, 703 F. App'x 986, 990 (Fed. Cir. 2017) (quoting *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1321 (Fed. Cir. 2016)).  For example, the '245 patent recites "off-the-shelf" wireless devices that are "'insufficient to pass the test of an inventive concept.'"  *Electric Power Grp.,* 830 F.3d at 1355; *see also* Appx135(6:52-56) (discussing the wireless device).

For at least these reasons, the claims of the Asserted Patents are directed to an abstract idea implemented in a routine and conventional way.  This Court should therefore reverse the district court's patent eligibility finding.

## CONCLUSION

For the reasons explained above, this Court should affirm the district court's rulings with respect to GoTV's evidentiary motions, inducement claims, invalid '865 patent, and pre-judgment interest.  However, this Court should reverse, or at minimum vacate, the district court's determination that the claims of the Asserted Patents are directed to patent eligible subject matter.

Respectfully submitted,

/s/ Thomas G. Saunders

INDRANIL MUKERJI
STEPHEN A. MARSHALL
ALIZA GEORGE CARRANO
WILLKIE FARR AND
   GALLAGHER LLP
1875 K Street NW
Washington, DC  20006
(202) 303-1190

DEVON W. EDWARDS
WILLKIE FARR AND
   GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019
(212) 728-8650

THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

LAUREN MATLOCK-COLANGELO
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007

*Attorneys for Defendant-Cross-Appellant Netflix, Inc.*

August 21, 2024

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 15 unique words (including numbers) marked confidential.

| X | This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A). |

| | This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b). |

| | This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements. |

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

August 21, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.     The filing has been prepared using a proportionally-spaced typeface and includes 16,414 words.

2.     The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

August 21, 2024

# ADDENDUM

# TABLE OF CONTENTS

**Pages**

Order Re Defendant's Motions for Judgment on the Pleadings,
Dkt. 109.................................................................................... Appx41-48

Order Granting Joint Stipulation Regarding Patent Ineligible
Subject Matter, Dkt. 335............................................................ Appx77-78

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Joseph Remigio | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| Not Present | | Not Present |

**Proceedings:** **(IN CHAMBERS) Order Re: Defendant's Motions for Judgment on the Pleadings [DE 83, 89]**

## I.   INTRODUCTION

On October 17, 2022, GoTV Streaming, LLC ("Plaintiff") filed a Complaint against Netflix, Inc. ("Defendant") alleging claims for patent infringement. (ECF No. 1.) On November 10, 2022, Plaintiff filed a First Amended Complaint ("FAC"), adding claims for induced patent infringement. (ECF No. 30.) On February 16, 2023, the Court dismissed with leave to amend Plaintiff's induced patent infringement claims. (ECF No. 64.) Plaintiff declined to further amend the FAC. On March 14, 2023, Defendant filed an Answer and Amended Counterclaim, seeking declaratory judgment that each of the asserted patents are invalid and not infringed. (ECF No. 71.) On March 23, 2023, Plaintiff filed its Answer to Defendant's Amended Counterclaim, denying the majority of Defendant's allegations. (ECF No. 73.)

Presently before the Court are Defendant's Motions for Judgment on the Pleadings of: (1) invalidity under 35 U.S.C. § 101; and (2) no pre-suit damages under 35 U.S.C. § 287(a). (ECF Nos. 83, 89.) For the following reasons, the Court **DENIES** both Motions.

## II.   FACTUAL BACKGROUND

The following facts are alleged in the FAC:

Plaintiff is a "mobile media network and applications developer" that specializes in "delivering media content to mobile users." (FAC ¶ 8.) Plaintiff is currently the sole and exclusive owner of multiple patents directed to rendering content on wireless devices. Three of these patents are United States Patent Nos. 8,103,865 (the "'865 Patent"), 8,478,245 (the "'245 Patent"), and 8,989,715 (the "'715 Patent") (collectively, the "Patents-in-Suit").

Defendant operates a streaming media platform. Defendant's platform allows wireless devices such as smartphones, tablets, and streaming media players to receive content from a server configured to properly render on the device.

**APPX00041**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

## III.   JUDICIAL STANDARD

A motion for judgment on the pleadings under Federal Rule of Civil Procedure ("Rule") 12(c) is "functionally identical" to a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). The same judicial standard applies to motions brought under either rule. *Cagasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).  The only significant difference is that a Rule 12(c) motion is brought after an answer has been filed, but early enough not to delay trial, whereas a 12(b)(6) motion must be filed before an answer. Fed. R. Civ. P. 12(b)–(c).

In ruling on a Rule 12(c) motion, courts must assume the allegations in the challenged complaint are true, and must construe the complaint in the light most favorable to the non-moving party. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996); *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). A motion for judgment on the pleadings is "properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Nelson v. City of Irvine*, 143 F.3d 1196, 1200 (9th Cir. 1998). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

Further, it is well-established that a court may address whether a patent is ineligible under 35 U.S.C. § 101 through a motion for judgment on the pleadings. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014). Likewise, a court may address whether a plaintiff may seek pre-suit damages through a motion for judgment on the pleadings. *See, e.g.*, *DivX, LLC v. Hulu, LLC*, 2021 WL 4459368, at *4 (C.D. Cal. June 11, 2021).

## IV.   DISCUSSION

Defendant brings two separate Motions for Judgment on the Pleadings: (1) that the Patents-in-Suit are invalid because they are directed to unpatentable subject matter under 35 U.S.C. § 101; and (2) that Plaintiff is barred from seeking pre-suit damages. The Court addresses each Motion in turn.[1]

### A.   Invalidity Under 35 U.S.C. § 101

Defendant argues that the Patents-in-Suit are invalid because they are directed to unpatentable subject matter under 35 U.S.C. § 101. Under § 101, anyone who "invents or discovers any new and

---

[1] The Court notes that Plaintiff attaches hundreds of pages of exhibits alongside its Opposition to the Motion for Judgment on the Pleadings of Invalidity, asking that the Court convert the Motion to a motion for summary judgment pursuant to Rule 12(d). The Court finds that this evidence is unnecessary and thereby declines to convert this Motion. *See Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1021 (C.D. Cal. 2015) ("Courts regularly decline to consider declarations and exhibits submitted in support of or opposition to a motion to dismiss [ ] if they constitute evidence not referenced in the complaint or not a proper subject of judicial notice.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent. 35 U.S.C. § 101. However, § 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Intern.* ("*Alice*"), 573 U.S. 208, 216 (2014) (quoting *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

In *Alice*, the Supreme Court articulated a two-step test to determine whether a claim is patent eligible under § 101 ("the *Alice* test"). *Id.* at 218. Under the *Alice* test, "a claim falls outside § 101 if (1) it is directed to a patent-ineligible concept like an abstract idea, and (2) it lacks elements sufficient to transform the claim into a patent-eligible application." *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir. 2023) (citing *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166–67 (Fed. Cir. 2018)).

Under *Alice* step one, the court must first determine whether the claim is directed to an abstract idea. At this step, the court examines "what the patent asserts to be the focus of the claimed advance over the prior art," by "focus[ing] on the language of the asserted claims, considered in the light of the specification." *Id.* (citing *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019); *Yu v. Apple*, 1 F.4th 1040, 1043 (Fed. Cir. 2021)). For claims directed at computer-related technology, the court must ask "whether the focus of the claims is on the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). If the claims are not directed to a patent-ineligible concept, the claims are patent-eligible and the inquiry ends. *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1262 (Fed. Cir. 2017).

If the claims are directed to a patent-ineligible concept, the court proceeds to *Alice* step two and determines whether the claim's elements, considered both individually and as an ordered combination, contain an "inventive concept" that transforms the nature of the claim into a patent-eligible application. *Alice*, 573 U.S. at 225. A claim contains an inventive concept if the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (quoting *Alice*, 573 U.S. at 225).

1.   <u>*Application of the Alice Test to a 12(c) Motion*</u>

Defendant brings this Motion under Rule 12(c) after having filed its Amended Answer and Counterclaim. As part of the Counterclaim, Defendant alleges that the Patents-in-Suit fail both steps of the *Alice* test because they "are directed to an abstract idea without any inventive concept . . . [and] recite well-known, routine, and conventional steps using generic computing resources." (Amended Counterclaim ¶¶ 35, 68, 101.) Plaintiff denies these allegations. (Answer to Counterclaim, ¶¶ 35, 68, 101.)

**APPX00043**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

Plaintiff argues that the Court must, as a matter of procedure, treat Defendant's allegations with respect to the *Alice* test as false and therefore deny the instant Motion because on a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which are denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). In essence, Plaintiff seems to argue that Defendant cannot bring a Rule 12(c) motion on any issue alleged in its counterclaim.

This argument, clever as it may be, is untenable. Each of the allegations that Plaintiff challenges speaks to the contents of the Patents-in-Suit. There is no question that the Court may consider the Patents-in-Suit on a Rule 12(c) motion, as they are "documents incorporated by reference in the [FAC]." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). To make assumptions about the contents of the Patents-in-Suit based on the parties' allegations would be improper, as courts "are not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice." *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013); *see also Cox v. Reliance Standard Life Ins. Co.*, 2014 WL 896985, at *4 (E.D. Cal. Mar. 6, 2014) (declining to accept as true plaintiffs' allegations that contradicted a life insurance policy attached as an exhibit to the complaint) (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)).

Other courts presented with § 101 arguments on Rule 12(c) motions are in accord. Courts routinely engage in the § 101 analysis despite the plaintiff having denied allegations on the same § 101 issues. *See Modern Telecom Sys. v. Juno Online Servs., Inc.*, 2015 WL 1239992 (C.D. Cal. Mar. 17, 2015) (applying the *Alice* test); Counterclaims ¶ 17, *Modern Telecom Sys. v. Juno Online Servs., Inc.*, 8:14-cv-00348-DOC-AN (C.D. Cal. Aug. 21, 2014), ECF No. 24 (alleging that "[e]ach of the claims of the Patents-in-Suit are invalid for failure to comply with one or more of the requirements [of] 35 U.S.C. §§ 101, 102, 103, and/or 112."); *see also, e.g.*, *Whitepages, Inc. v. Isaacs*, 196 F. Supp. 3d 1128 (N.D. Cal. 2016); *Loyalty Conversion Sys. Corp. v. Am. Airlines*, 66 F. Supp. 3d 829 (E.D. Tex. 2014).

Accordingly, the Court declines to assume Defendant's allegations regarding the eligibility of the Patents-in-Suit are false, and instead, disregards the allegations as outside the challenged pleading.

2.  *Representative Claims*

Plaintiff alleges that Defendant violates multiple claims in each of the Patents-in-Suit. (FAC ¶¶ 20–22, 43–45, 68–70.) In the instant Motion, Defendant argues that each claim of each patent is invalid, analyzing just the first claims of each patent, which Defendant asserts are representative of the remaining claims. Indeed, "[c]ourts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316, 1316 n.9 (Fed. Cir. 2016)).

**APPX00044**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

Here, the Court finds it appropriate to treat the first claims as representative. Defendant adequately explains that the claims of each patent are "substantially similar and linked" to the first claims. (Def.'s Mot. J. Pleadings Patent Invalidity at 6–7, 11–12, 16–17, ECF No. 83-1.) Moreover, Plaintiff admits in the FAC that the first claims are representative. (FAC ¶¶ 23, 46, 71.) While Plaintiff now half-heartedly disputes its earlier characterization in its Opposition, pointing out that the latter claims include various different limitations, Plaintiff fails to argue how these limitations confer any distinctive significance for the invalidity analysis. (Pl.'s Opp'n Mot. J. Pleadings Patent Invalidity at 9–10 n.4, ECF No. 88.) Thus, the Court proceeds to analyze the representative first claims of each patent.

3. *Claim 1 of the '865 Patent*

The '865 Patent is directed to a sever-implemented method for processing data for a wireless device. (FAC ¶ 15.) Claim 1 reads:

> 1. A server implemented method for processing data for a wireless device, comprising:
>> receiving from the wireless device a request for an application program, said request including an indication of a type of the wireless device;
>> executing, in response to receiving said request, said application program to generate a wireless device generic template including a plurality of content items;
>> sending a custom configuration to the wireless device, said custom configuration being specific to said application program;
>> generating a page description based on said wireless device, said page description having at least one discrete low level rendering command that is within said rendering capability of said wireless device but that is of a syntax that is wireless device generic; and
>> sending said page description to the wireless device such that the wireless device is capable of presenting at least one content item from said plurality of content items using both said page description and said custom configuration.

('865 Patent at 20:42–63.)

Defendant argues that claim 1 of the '865 Patent is "directed to the abstract idea of formatting data on a server for presentation on a wireless device based on information about that device." (Def.'s Mot. J. Pleadings Patent Invalidity at 7 (citing *Device Enhancement LLC v. Amazon.com Inc.*, 189 F. Supp. 3d 392, 404 (D. Del. 2016).) Plaintiff disagrees, arguing that claim 1 is directed to a specific improvement in computer capabilities, namely the use of a server-side application that "relieve[s] developers of needing to develop separate applications for each type of supported wireless device." (Pl.'s Opp'n Mot. J. Pleadings Patent Invalidity at 10–11 (citing '865 Patent at 20:14–18).)

APPX00045

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|----------|----------------------|------|--------------|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

On balance, the Court agrees with Plaintiff. The Federal Circuit's decision in *Visual Memory* is instructive. In *Visual Memory*, the asserted claim recited a computer memory system that was more compatible with different processors through use of "programmable operational characteristics" configurable based on the type of processor. *Visual Memory*, 867 F.3d at 1256–57. The Federal Circuit found that the claim was patent-eligible, explaining that the claim focused on a specific improvement in computer capabilities—the use of programmable operational characteristics—rather than the mere computer implementation of the abstract idea of categorical data storage. *Id.* at 1259 (citing *Enfish*, 822 F.3d at 1336), *cf. Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding that a claim was ineligible as directed to an abstract idea because it simply recited using a computer to scan, recognize, and store data). The Federal Circuit further noted that the use of this memory system had a clear benefit, as it "obviate[d] the need to design a separate memory system for each type of processor, which proved to be costly and inefficient." *Visual Memory*, 867 F.3d at 1259. Here, claim 1 similarly recites a more compatible data processing system that allows data to be tailored to devices through an "application program" using "device generic templates" and "custom configurations." ('865 Patent at 20:46–53.) The claim is focused on specific improvements in computer capabilities, namely, the use of these application programs, device generic templates, and custom configurations, rather than the abstract idea of formatting data on a server based on information about a wireless device. Further, the claimed data processing system has stated benefits, as it "relieve[s] developers of needing to develop separate applications for each type of supported wireless device." (Pl.'s Opp'n Mot. J. Pleadings Patent Invalidity at 11 (citing '865 Patent at 20:14–18).)

Defendant argues that *Visual Memory* is inapplicable because the '865 Patent does not explain its purported specific improvement in as much detail as *Visual Memory*. The Court disagrees. The '865 Patent provides ample specificity. (*See, e.g.*, '865 Patent at 7:58–11:8 (describing the format and use of custom configuration data); *id.* at 16:40–17:60 (describing how the application program handles requests, converts data using generic templates with the use of a "template engine" and a "layout solver" based on the client profile).) While *Visual Memory* went a step further by including a "microfiche appendix having a combined total of 263 frames of computer code," there is no indication that such code was necessary to the Federal Circuit's finding of eligibility. *Visual Memory*, 867 F.3d at 1261. The Court finds the '865 Patent's lack of code of little consequence.

Thus, the Court finds that claim 1 of the '865 Patent is directed to specific improvements in computer capabilities rather than an abstract idea, thereby satisfying the first step of the *Alice* test. Because the Court finds that the claim satisfies the first step of the *Alice* test, the Court need not consider the second step. *Visual Memory*, 867 F.3d at 1262 ("Because we conclude that the claims . . . are not directed to an abstract idea, we need not proceed to step two of the *Alice* test."). Accordingly, the Court **DENIES** Defendant's Motion with respect to the claims of the '865 Patent.

4.   *Claim 1 of the '245 and '715 Patents*

The '245 and '715 Patents are both directed to methods for rendering content on a wireless device. (FAC ¶¶ 16–17.) The exact language of the claims are of little importance, as here, the parties

**APPX00046**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

agree that the patents use the same specification as the '865 Patent and describe the same data processing system but from the perspective of the wireless device rather than the remote server.

Defendant similarly argues that claim 1 of the '245 Patent and the '715 Patent are "directed to the abstract idea of formatting data on a server for presentation on a wireless device based on information about that device." (Def.'s Mot. J. Pleadings Patent Invalidity at 12, 17.) Because the claims describe the same data processing system and share the same specification, however, the Court finds that claim 1 of the '245 Patent and '715 Patent are both directed to specific improvements in computer capabilities much like the '865 Patent. Accordingly, the Court **DENIES** Defendant's Motion with respect to the claims of the '245 Patent and '715 Patent.

Having found that each of the Patents-in-Suit survive the *Alice* test, the Court **DENIES** Defendant's Motion for Judgment on the Pleadings of Invalidity under 35 U.S.C. § 101.

**B.** **Pre-Suit Damages**

Defendant argues that Plaintiff is not entitled to pre-suit damages because Plaintiff failed to plead compliance with the patent marking requirements set forth under 35 U.S.C. § 287(a). Section 287(a) limits a patentee's ability to recover damages for infringement, stating, in pertinent part:

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented . . . by fixing thereon the word "patent" . . . . In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

"The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) (hereinafter "*Arctic Cat I*"). However, "[t]he notice provisions of § 287(a) do not apply to patents directed to processes or methods. Nor do they apply when a patentee never makes or sells a patented article." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 950 F.3d 860, 865 (Fed. Cir. 2020) (hereinafter "*Arctic Cat II*") (citing *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 395 (1936)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:22-cv-07556-RGK-SHK | Date | May 24, 2023 |
|---|---|---|---|
| Title | ***GoTV Streaming, LLC v. Netflix, Inc.*** | | |

The FAC is silent as to whether Plaintiff complied with § 287(a), as it does not indicate whether Plaintiff marked any patented products. Plaintiff argues in its Opposition that this is because Plaintiff never made or sold any patented products, and thus it did not need to plead compliance with § 287(a). Defendant counters, arguing that regardless of § 287(a)'s ultimately applicability, Plaintiff still "bears the burden of pleading and proving" compliance. *See Arctic Cat I*, 876 F. 3d at 1366. The Court disagrees.

As the Court has previously observed, the requirement to plead and prove compliance with § 287(a) "only makes sense if § 287(a) applies." *In re Katz Interactive Call Processing Patent Litig.*, 2009 WL 8635995, at *4 (C.D. Cal. Aug. 3, 2009). Defendant argues that the Court's finding in *In re Katz* is no longer good law, however, as it predates the Federal Circuit's decision in *Arctic Cat I*. However, the Court sees no conflict between the two cases. While *Arctic Cat I* requires that a patentee plead compliance with § 287(a), *Arctic Cat II* clarifies that § 287(a) is inapplicable when a patentee asserts only process or method claims, or never sells a patented product. *Arctic Cat I*, 876 F.3d at 1366; *Arctic Cat II*, 950 F.3d at 865. Except for a single case from Delaware, Defendant does not identify any authority suggesting that a patentee must affirmatively plead compliance with § 287(a) when it is inapplicable. *See Express Mobile, Inc. v. Liquid Web, LLC*, 2019 WL 1496999, at *2 (D. Del. Apr. 15, 2019) (holding that a patentee must plead compliance with § 287(a) "even when compliance is achieved, factually, by doing nothing at all"). Indeed, in a more recent case in this district, a court rejected this exact argument, ultimately declining to dismiss pre-suit damages as to method claims despite the complaint's silence as to § 287(a). *DivX, LLC v. Hulu, LLC*, 2021 WL 4459368, at *4 (C.D. Cal. June 11, 2021).[2] For these reasons, the Court rejects Defendant's argument and finds that Plaintiff did not need to plead compliance with § 287(a) because § 287(a) is inapplicable to Plaintiff's claims.

Accordingly, the Court **DENIES** Defendant's Motion for Judgment on the Pleadings of No Pre-Suit Damages.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Judgment on the Pleadings of Invalidity under 35 U.S.C. § 101, and Defendant's Motion for Judgment on the Pleadings of No Pre-Suit Damages under 35 U.S.C. § 287(a).

**IT IS SO ORDERED.**

**JRE/sf**

---

[2] Defendant argues in its Reply that *DivX* supports its position because it "join[ed] other courts in holding that a patentee must plead compliance with 35 U.S.C. § 287(a) to properly plead pre-suit patent infringement damages flowing from non-method claims." *DivX*, 2021 WL 4459368, at *4. However, this quote shows that the court recognized that no pleading is necessary when § 287(a) is inapplicable, specifically when asserting only method claims. While it does not specify that the same applies when a patentee does not make or sell a patented product, Defendant provides no explanation for why such a patentee should be held to a different standard.

**APPX00048**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 3400
LOS ANGELES, CA 90067
310.855.3000

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

GOTV STREAMING, LLC,

        Plaintiff,

    v.

NETFLIX, INC.,

        Defendant.

Case No. 2:22-cv-07556-RGK-SHK

Hon. R. Gary Klausner
Courtroom 850 – Roybal

~~[PROPOSED]~~ **ORDER GRANTING JOINT STIPULATION REGARDING PATENT INELIGIBLE SUBJECT MATTER** **[350]**

Trial Date:     October 17, 2023
Time:        9:00 a.m.
Crtrm:      850

FAC Filed:    November 10, 2022

1                                           ~~[PROPOSED]~~ ORDER

2          Having considered the Joint Stipulation Regarding Patent Ineligible Subject

3 Matter, and finding good cause,

4      IT IS HEREBY ORDERED THAT:

5        1. The Court's denial of Netflix's Motion (Dkt. No. 109) constitutes the

6            Court's judgment as a matter of law that the claims of the Asserted

7            Patents are not invalid under 35 U.S.C. § 101 and conclusively

8            resolves Section 101 issues for the purposes of this case;

9        2. No further issues of fact remain to be tried to the jury regarding

10           Netflix's Section 101 defense and counterclaims;

11        3. Netflix will not present any evidence regarding its Section 101

12           defense at trial; and

13        4. GoTV agrees by not presenting any evidence at trial regarding its

14           Section 101 defense, Netflix has not waived any rights it may have

15           regarding that defense.

16      IT IS SO ORDERED.

17

18 Dated:    **10/10/2023**            By:                           

19                                           Honorable R. Gary Klausner

                                              United States District Court Judge

20

21

22

23

24

25

26

27

28

~~[PROPOSED]~~ ORDER GRANTING JOINT STIPULATION REGARDING PATENT INELIGIBLE
SUBJECT MATTER

**APPX00078**

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 3400
LOS ANGELES, CA 90067
310.855.3000